392 A.2d 750

COMMONWEALTH of Pennsylvania

v.

James TOLASSI, Jack Yocum, James Shirley, Michael O'Brien, Joseph O'Brien, Russ Columbo, Joseph Taylor, Robert Layton, Jr., Richard McLain, Max Hinkel, III, Michael Dolinski, Appellants.

Superior Court of Pennsylvania.

Argued June 18, 1976.

Decided Oct. 20, 1978.

196

Robert F. Simone, Philadelphia, for appellants.

William T. Nicholas, First Assistant District Attorney, Norristown, with him Milton O. Moss, District Attorney, Norristown, for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

CERCONE, Judge:

The instant appeal follows appellants' convictions for various offenses arising from the destruction of a construction site in Montgomery County on June 5, 1972. There is no reason to set forth at length the facts of the incident in this opinion, as we have already done so in the related case of *Commonwealth v. Reeves*, 479 Pa.Super. 146, 387 A.2d 877 (1978). Suffice it to say that the investigation of the incident and the trials of those accused of participating in it were long and arduous. Because of the verisimilitude of the two trials many of the issues raised on appeal in the instant case are the same as those raised in *Reeves*.[1] On the other hand, the trials were not concurrent, so that the nature and

---

1. In addition, many of the issues raised in this case were discussed in the dissenting opinion authored by Judge Price in *Commonwealth v. Reeves, supra.*

extent of the publicity which attended the trial of appellants in this case was different. In fact, because the trial in the instant case occurred more than three months after the trial in *Reeves,* adversely inflammatory publicity had substantially abated. In large part for this reason, as will be explained more fully hereinafter, we do not find that the trial court in the instant case abused its discretion in refusing to sequester the jury or in refusing to inquire more frequently into the exposure of the individual jurors to prejudicial publicity. Furthermore, finding no reversible error in appellants' additional contentions, we will affirm the judgments of sentence.

First, appellants argue that the trial court erred in refusing to grant their requests for severance prior to trial. The thrust of appellants' argument appears to be that the number of defendants in this case (fourteen), together with nature of the Commonwealth's identification evidence (entirely photographic), collaborated to deny the individual appellants a fair trial. We disagree. This case was already the product of a severance. Of the twenty-three persons initially charged with playing an active part in destroying the construction site and its equipment, nine were severed for trial in *Commonwealth v. Reeves, supra.* The remaining fourteen, eleven of whom were convicted and have appealed, were tried in this case, and all of these defendants were charged with the same offenses; to wit, conspiracy, riot, and malicious destruction of fences.

The general rule is that questions of consolidation or severance of defendants for trial rest in the discretion of the trial judge and his rulings on such matters will not be disturbed on appeal except for a manifest abuse of discretion. See *Commonwealth v. Hirsch,* 225 Pa.Super. 494, 311 A.2d 679 (1973); Pa.R.Crim.P. 219(d). In addition, when a conspiracy is alleged the defendants should usually be tried together. *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A.2d 820 (1954), *cert. denied* 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688; *Commonwealth v. Schwartz,* 210 Pa.Super. 360, 233 A.2d 904 (1967), *aff'd* 432 Pa. 522, 248 A.2d 506, *cert. denied* 398 U.S. 957, 90 S.Ct. 2161, 26 L.Ed.2d 541; *United States v.*

*Segal*, 534 F.2d 578 (3rd Cir. 1976). The American Bar Ass'n Project on Minimum Standards for Criminal Justice, Standards Relating to Joinder and Severance (1968) support the trial judge's order refusing severance in the instant case. In the commentary to Section 2.3(b) of the Standards the advisory committee recommends consideration of three factors in reaching a decision on severance: (1) Whether the number of defendants or the complexity of the evidence as to the several defendants is such that the trier of fact probably will be unable to distinguish the evidence and apply the law intelligently as to the charges against each defendant; (2) Whether evidence not admissible against all the defendants probably will be considered against a defendant notwithstanding admonitory instructions; and (3) Whether there are antagonistic defenses. In the trial of the instant case, all the evidence was admissible against all the defendants, and there were no antagonistic defenses presented. While fourteen is a large number of defendants to be joined for trial, it must be remembered that proof of the corpus delicti of the various crimes charged in this case was identical for all the defendants. The only difficulty posed by joinder was that the jurors had to match photographs of the participants of the crime with the various faces and physiques of the men charged as defendants. On the other hand, both the trial in *Commonwealth v. Reeves, supra,* and the trial in the instant case were extraordinarily long trials, and the interests of administration of justice as well as the individual defendants' rights to speedy trials offered heavy counterweights to severance.[2] In light of these factors, and the absence of any showing of actual prejudice, we cannot find that the trial court abused its discretion in failing to grant severances to the various defendants.

2. Indeed, these defendants have already charged that their rights to speedy trials were denied to them in part because their trial was delayed until *Commonwealth v. Reeves, supra,* was tried. Furthermore, at the outset of these prosecutions when the Commonwealth moved to consolidate the twenty-three separate complaints, none of the defendants objected.

 Second, appellants argue that the trial court erred in denying their motion for a change of venue. Once again, dispositions of motions for change of venue rest within the sound discretion of the trial court. *Commonwealth v. Hoss,* 469 Pa. 195, 364 A.2d 1335 (1976); *Commonwealth v. Martinolich,* 456 Pa. 136, 318 A.2d 680 (1974). Alluding to the standards laid down in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), our Supreme Court in *Commonwealth v. Powell,* 459 Pa. 253, 259–60, 328 A.2d 507, 510 (1974) stated:

> "Extensive pretrial publicity within a county or district does not necessarily preclude a fair trial in that community. If the court is satisfied that an objective, open-minded jury can be selected from among the members of the community exposed to the publicity, it need not grant a change of venue."

Thus, ordinarily a court should not grant a motion for a change of venue until "it is determined after hearing that a fair and impartial trial cannot be held in the county in which the complaint was filed." Pa.R.Crim.P., Rule 312(a). As in *Commonwealth v. Powell, supra,* the trial judge in the instant case understood his obligation to probe the prospective jurors on individual voir dire to ascertain whether any had formed a fixed opinion of appellants' guilt. *Commonwealth v. Swanson,* 432 Pa. 293, 296, 248 A.2d 12 (1968), *cert. denied,* 394 U.S. 949, 89 S.Ct. 1287, 22 L.Ed.2d 483 (1969).[3]

**3.** The following questions were among those asked prospective jurors during voir dire:

(1) "The incident which gave rise to the charges against these defendants occurred on June 5, 1972, at a construction site of the Altemose Construction at Route 363 and First Avenue, in Upper Merion Township. Under construction at that time was a Sheraton Hotel Complex including two cinemas and an office building. Have you heard, read or seen any news media accounts of that incident? If so, what?"

(2) "Have you ever heard on the radio, or elsewhere, read or seen on television anything about these defendants? If so, what?"

(3) "Have you read, heard or seen on television any news items which, while not dealing directly with the events of June 5, 1972, or with these defendants, were in some way thought by you to be connected with this case? If so, what?"

The court conformed its standards of inquiry and evaluation of the jurors to those set forth in the cases discussed above, and on the facts of this case we cannot find that it abused its discretion in refusing to grant the motions for a change of venue. Especially since virtually all of the publicity connected with these cases ceased with the conclusion of the Reeves trial, we do not find that a change of venue was prerequisite to appellants' receiving a fair trial. See *Commonwealth v. Hoss, supra; Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282 (1976); *Commonwealth v. Nahodil,* 462 Pa. 301, 341 A.2d 91 (1975).

Third, appellants argue that the court erred in refusing to sequester the jury. In this regard it should be reiterated that there was relatively little publicity contemporaneous with the trial of these appellants; and, on the few occasions where potentially prejudicial publicity or other incidents occurred, the court acted diligently to insure it would have no impact on appellants' trial. For example, after eleven jurors had been selected on voir dire, a newspaper article dealing generally with union violence appeared in a Philadelphia newspaper. Upon being apprised of the article the court questioned each selected juror individually and dismissed the only juror who had read the article. A second article appeared in a newspaper shortly after the trial proper began. Although the court did not question each juror individually concerning this article, the court did employ the procedure it used continuously throughout the trial; it instructed the jury prior to every recess and at the end of every day to avoid discussing the case or reading, listening to or watching news accounts of the trial. Finally, when appellants alleged that a juror heard some prejudicial comments about the case while she was on an elevator at the

(4) "As a result of anything you heard, saw or read about this case, or any of the parties involved do you have an opinion about the guilt or innocence of any of the defendants? Do you now have an open mind as to the guilt or innocence of any of the defendants?"
(5) "You will also be instructed by me that the cases must be decided solely upon the basis of the evidence presented in this court room. Do you feel you will be able to conscientiously follow that instruction?"

courthouse, the court questioned her individually and established that she had not heard the alleged remarks. Hence, it can be seen that the atmosphere surrounding this trial was substantially less fraught with the perils of prejudicial publicity than had been the atmosphere surrounding the trial in *Reeves.*

Pa.R.Crim.P. 1111 provides the guidelines for determining the sequestration issue:

"(a) The trial judge may, *in his discretion,* order sequestration of trial jurors in the interests of justice.

(b) When sequestration is ordered, each juror, including any alternate, shall be sequestered from the time of acceptance as a juror until discharged.

(c) Nothing in subsection (b) shall prevent a trial judge from ordering sequestration, or vacating his order of sequestration, at any time during a trial when the interests of justice require."

The decision concerning sequestration of a jury because of the possibility of its infection with adverse publicity, therefore, rests soundly in the discretion of the trial court, and its decision will not be reversed unless the court "abused its discretion or committed an error of law which controlled the outcome of the case." *Commonwealth v. Stoltzfus,* 462 Pa. 43, 52, 337 A.2d 873, 877 (1975). See also *Commonwealth v. Swanson,* 432 Pa. 293, 248 A.2d 12 (1968). Of course, there are situations where the adverse publicity is so pervasive, intense and prejudicial that the law will presume that the jury's deliberations were affected by it. See, e. g., *Commonwealth v. Bruno,* 466 Pa. 245, 352 A.2d 40 (1976). In widely publicized or sensational cases, the court has a number of alternatives available to it in order to preserve the integrity of the fact-finding process. *Id.,* 466 Pa. at 261, 352 A.2d 40. Nevertheless, in most cases admonitions to the jury such as those which appear in the ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press § 3.5(e) (Tent.Draft 1966) will be sufficient. And, appellate courts will in such cases presume the efficacy of cautionary instructions unless actual prejudice is shown.

*Commonwealth v. Stoltzfus,* 462 Pa. at 55, 337 A.2d 873. Cf. *Commonwealth v. Martinolich,* 456 Pa. 136, 318 A.2d 680 (1974), *cert. denied,* 419 U.S. 1065, 95 S.Ct. 651, 42 L.Ed.2d 661 (1974).

In the instant case the court below acted vigorously to assure that appellants' trial was not tainted by extra-judicial commentary. Immediately after his selection, each juror was fully admonished as to his obligation to base his decision on the evidence produced in court and to eschew reading or hearing accounts in the media, or discussing the case with individuals. Continuously during the lengthy trial the court renewed this warning. Because the trial court was circumspect in assuring that the jury neither read nor heard any account which might affect its deliberations, and there was relatively little prejudicial publicity contemporaneous with this trial, and since appellants have not shown actual prejudice which resulted from the court's refusal to sequester the jury, we find that the court did not abuse its discretion in refusing to sequester the jury during this lengthy trial. Cf. *Commonwealth v. Dukes,* 460 Pa. 180, 331 A.2d 478 (1975). Compare *Commonwealth v. Reeves, supra.*

Fourth, appellants argue that they were denied their constitutional right to a speedy trial.[4] The fourteen appellants in this case were arrested on various dates throughout September and October, 1972. While it is true that nearly two years elapsed before they were tried, from the outset it was apparent that scheduling difficulties would arise. Immediately following appellants' arrests publicity was intense, the number of defendants was large, and several of the most renowned criminal lawyers in southeastern Pennsylvania, whose schedules would have to be unblocked and synchronized, were retained as defense counsel. Furthermore, the trial in the *Reeves* case was the longest in the history of Montgomery County. Indeed, it is paradoxical that appellants claim on the one hand that their cases should have

4. Since the complaints in the instant case were filed prior to June 30, 1973, Pa.R.Crim.P., Rule 1100 does not apply. Instead, the balancing test of *Barker v. Wingo,* infra, is applicable.

been severed and separately tried, and on the other hand lay much of the blame for the delay in their trial on the fact that nine of the defendants were severed for separate trial in *Reeves*.

Nevertheless, the standard to be applied when a speedy trial claim is raised is a balancing test, whereby the court should consider, in general, four factors: (1) The length of the delay; (2) The reason for the delay; (3) The assertion of the right by the defendants; (4) The prejudice to the defendants. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *Commonwealth v. Hamilton*, 449 Pa. 297, 297 A.2d 127 (1972). In applying these factors to the instant case it can readily be seen that appellants were not denied their right to a speedy trial. Although a delay of nearly two years is sufficient to warrant further inquiry into appellants' speedy trial claim, other considerations coalesce to persuade us that the court properly denied appellants' motion to dismiss the indictments. As was indicated above, the delay was occasioned by the unique circumstances of this case which were largely beyond the control of the district attorney's office and the court. Furthermore, the record establishes that appellants never demanded a trial nor expressed any concern that their rights would be prejudiced if their trial was not promptly held. Only in July, 1974, did appellants exude any indication that they wished no further delay, and that was simply by way of a negative response to the court's suggestion that a continuance might be necessary in order to secure the presence of Attorney Cecil B. Moore for the trial. Following appellants' objections, trial proceeded without the presence of Mr. Moore. Furthermore, appellants have shown no prejudice to their cases by the delay and merely restate their displeasure with the adverse publicity which preceded their trial. This complaint is incongruous because the delay in trying appellants improved rather than exacerbated their chances for a fair trial. In light of the fact that none of the appellants were incarcerated prior to trial and that failing memories of witnesses were not a factor in this case, no prejudice, either actual or potential, can be inferred.

Fifth, appellants argue that the court erred in refusing to compel the Commonwealth to disclose the identity of an eyewitness-informant. For a variety of reasons we find this argument to be specious. The witness at issue was one of sixty-two whose identity was known to the Commonwealth; and, the identity of the other sixty-one witnesses had been provided to the defense. This remaining witness, however, had expressed a profound fear for his safety if his identity should be disclosed, and the Commonwealth promised that it would not be. On that condition the witness provided the names of two of the defendants whom he recognized *from the photographs* of the rioting. Although he had been at the scene, the witness was unable to identify any of the perpetrators of the violence on that basis. In sum, the witness could have been of no use at trial insofar as the defense was concerned; the most nearly exculpatory testimony he could have given was that he did not note during the rioting whether any of the instant appellants were participants. In light of the fact that there were nearly one thousand men at the scene, of whom some one or two hundred rioted, such testimony would not have had any probative value, a point which is underscored by the fact that the defense called none of the remaining sixty-one witnesses whose identities were known to testify.

In *Roviaro v. United States,* 353 U.S. 53, 60–62, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957) the Supreme Court laid down what is now the oft-cited test for determining whether the government must forego the privilege of protecting the identity of an informant:

"Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action.

. . . . .

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing

the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors."

In the instant case the balance weighs heavily in the Commonwealth's favor. The court found that the witness' testimony would have little if any relevance, while the danger of recriminations from those who would consider him a "traitor" were great. Compare *Commonwealth v. Carter*, 427 Pa. 53, 233 A.2d 284 (1967). That being the case, appellants' argument that the court abused its discretion in not requiring the Commonwealth to disclose his identity is frivolous. See *Commonwealth v. Garvin*, 448 Pa. 258, 293 A.2d 33 (1973); *Commonwealth v. Williams*, 236 Pa.Super. 184, 345 A.2d 267 (1975).

■ Sixth, appellants contend that the lower court erred in permitting the district attorney to comment on the photographs of the scene by pointing out likelinesses between persons appearing in the photographs and the various defendants. The identification procedure of which appellants complain is recorded as follows:

"Now, members of the jury, let's take one at a time. The first man, DETECTIVE CANNON testified that he got an arrest warrant for an individual by the name of RICHARD McLAIN. He pointed out this man right on the front as RICHARD McLAIN."

"All right, I suggest to you, members of the jury, and I'm pointing my pen at this individual we're talking. I said, about RICHARD McLAIN, and I invite your attention to this person right here, and I'm pointing my pen at a certain individual who is on Ct–12–A.

"I'm pointing my pen at the man in the stripes—vertical striped pants in the light shirt . . . . and the tattoo on his arm."

"Now, I am showing the jury Ct–41 and again I am pointing my pen, talking to you, I suggest about the same individual. This photograph shows him full face, I suggest to you.

. . . . .

"And I suggest to you, members of the jury, that when you look at those pictures, look at this individual . . . everything about him, the tattoos, the hair style, the stature, the size, that you should conclude beyond a reasonable doubt that is RICHARD McLAIN."

"Now, what's he doing in that picture? I suggest to you that what he is doing is preparing to jump on that fence. Is there any doubt about it?"

Virtually all of the district attorney's closing argument concerning the identification of the various appellants was in a similar vein. Mr. Nicholas then concluded this procedure by stating:

"Members of the jury, we have gone through each of the 14 defendants and I pointed out to you, I submit, on the photographs certain individuals. You have examined those photographs, you will examine them at even greater detail when you retire to deliberate. We have examined them, obviously. Detective Cannon spent hours and hours and hours. And we have lived with this case for three summers, I suppose, and two winters since it happened, and you have understood from the reports that I was involved in the appellant's brief of the investigation. And shortly our labor will be complete and the matter will be submitted to your hands for judgment.

"And, really, the pictures, I submit, tell it all. You have those pictures—you will have them."

Appellants contend that this method of argument is improper because it is equivalent to unsworn testimony by the district attorney on the identities of the rioters and constitutes an expression of opinion of the district attorney on the merits of the case which, in combination, were so "impermissibly suggestive as to be conducive to irreparable mistaken

identification." *Foster v. California,* 394 U.S. 440, 442, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). We disagree.

Appellants' reliance on cases where the prosecutor expressed his opinion on the guilt of the accused is misplaced, because the statements made by the prosecutors in those cases effectively usurped the function of the jury and went far beyond fair argument based upon the evidence presented. Compare *Commonwealth v. Lipscomb,* 455 Pa. 525, 317 A.2d 205 (1974); *Commonwealth v. Toth,* 455 Pa. 154, 314 A.2d 275 (1974); *Commonwealth v. Revty,* 448 Pa. 512, 295 A.2d 300 (1972). In the instant case the candid photographs taken at the scene of the crime were numerous and were group photographs. In drawing the jury's attention to a particular person depicted in a photograph and pointing to a particular defendant, the district attorney was in no sense testifying or offering his opinion on a material fact. Obviously, the jury was entitled to infer that a person depicted in a picture at the scene of a crime who resembled one of the defendants was in fact one of the defendants, and the district attorney was merely arguing that the jury draw that inference. Were we to include phrases like "I submit" and "I suggest" among those forms of argument deemed improper, we would virtually destroy the Commonwealth's recognized right to argue fair inferences arising from the evidence to the jury. Certainly Mr. Nicholas' closing argument in the instant case does not lead us to conclude, as the Court did in *Commonwealth v. Russell,*[5] that the district attorney "not only expressed his opinion on the guilt of [appellants], but . . . also expressed an opinion on the believability of the defense witnesses . . . without proper foundation." See *Commonwealth v. Hoffman,* 439 Pa. 348, 354–55, 266 A.2d 726 (1970). The district attorney's comments herein merely expressed fair deductions from the photographic evidence presented. *Commonwealth v. Meyers,* 290 Pa. 573, 139 A. 374 (1927). See also *Commonwealth v. Wiggins,* 231 Pa.Super. 71, 328 A.2d 520 (1974). Hence, appellants were not entitled to a mistrial.

5. 456 Pa. 559, 563, 322 A.2d 127, 130 (1974).

210

For the foregoing reasons, the judgments of sentence are affirmed.

JACOBS, President Judge, concurs in the result.

WATKINS, former President Judge, and HOFFMAN, J., did not participate in the consideration or decision of this case.