J-A21004-14

2015 PA Super 12

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| EILEEN O'NEIL, | |
| Appellant | No. 2506 EDA 2013 |

Appeal from the Judgment of Sentence July 15, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0001668-2011

BEFORE: BOWES, OTT, and STRASSBURGER,[*] JJ.

OPINION BY BOWES, J.:						**FILED JANUARY 20, 2015**

Eileen O'Neil appeals from the judgment of sentence of six to twenty-three months incarceration to be followed by two years of probation after a jury found her guilty of two counts each of conspiracy to commit corrupt organizations and theft by deception. We reverse and remand for a new trial.

The charges in this case arose after the Commonwealth uncovered the ghastly acts of Dr. Kermit Gosnell at his abortion clinic. The Federal Bureau of Investigations ("FBI"), the Drug Enforcement Agency ("DEA"), and Philadelphia District Attorney's Office detectives conducted a raid at Gosnell's

---

[*] Retired Senior Judge assigned to the Superior Court.

abortion clinic, the Women's Medical Society Clinic, on February 18, 2010. The investigation was largely focused on Gosnell's alleged illegal issuance of prescription medication and performance of illegal abortions. As a result of the investigation, law enforcement uncovered the deaths of born-alive infants and one mother during a botched abortion. The Commonwealth charged Gosnell with seven counts of first-degree murder based on the deaths of seven newborn infants, and third degree murder in the death of Karnamaya Mongar.[1] In addition, the Commonwealth charged Gosnell with conspiracy to commit murder, Abortion Act violations, corrupt organizations and other crimes. In total, Gosnell faced over 280 criminal counts.

Appellant worked at Gosnell's clinic and held herself out to be a licensed physician. However, while Appellant had completed medical school and a residency program, she was not licensed to practice medicine. Appellant was not alleged to have been involved in the killing of the newborn babies or Ms. Mongar. Rather, after a grand jury investigation, the Commonwealth charged Appellant with corrupt organizations, conspiracy to commit corrupt organizations, theft by deception, perjury, and false

_____

[1] Gosnell was convicted of multiple counts of first-degree murder and one count of third degree murder as well as a host of other charges. The court dismissed three of the homicide charges prior to the jury deciding the case. Following the verdict, Gosnell waived his right to appeal in exchange for the agreement of the Commonwealth not to continue to pursue the death penalty. Accordingly, he was sentenced to consecutive terms of life imprisonment without parole.

swearing.[2]   The corrupt organization and theft charges were based on her practice of medicine without a license and billing of patients as though she were a licensed doctor.  The Commonwealth tried Gosnell's case as a capital murder matter and joined Appellant's case with his for trial.  Initially, numerous other employees of the clinic, including Lynda Williams, Sherry West, Adrienne Moton, and Steve Massof were charged with murder.[3]  These individuals pled guilty to various charges prior to the trial of Appellant and Gosnell.

Appellant filed a motion to sever her case from Gosnell's on September 28, 2011.  The court denied that motion and the case proceeded to trial.  At trial, the aforementioned employees of the abortion clinic testified against Gosnell and Appellant.  The overwhelming majority of the testimony in the trial that spanned from March 18, 2013 until May 13, 2013, was directed at Gosnell's criminal violations.[4]  The testimony against Appellant would have consisted of no more than two or three days of the trial.

---

[2] The Commonwealth amended its criminal information to include nine counts of theft by deception and nine additional counts of conspiracy.  It also amended a conspiracy count to reflect that it was conspiracy to commit corrupt organization under 18 Pa.C.S. § 911(b).

[3] Gosnell's wife also was charged with various crimes and entered a guilty plea based on her involvement.

[4] Closing arguments were given on April 29, 2013 and jury deliberations began the following day.  The jury deliberated until May 13, 2013.

Moton, who had pled guilty to third-degree murder and conspiracy and entered a plea agreement in federal court on drug charges, testified as follows. According to Moton, Gosnell instructed her and other unlicensed staff to administer anesthesia to abortion patients when he was not present. Moton also testified that Gosnell frequently manipulated pre-abortion ultrasounds to perform abortions beyond the 24 week legal limit.

In multiple instances, late term abortion patients were provided with large doses of Cytotect,[5] resulting in live births. Moton provided that Gosnell trained her and other staff members to snip the necks of these live born babies with surgical scissors, causing their deaths. She estimated that Gosnell and Steve Massof performed this task over twenty times, and that she herself had done the same on ten occasions. On one occasion, Moton took a picture of a baby after Gosnell killed the child by snipping its neck because she was disturbed at how large the child was when it was born. The baby was over 29 weeks old.

Moton, however, set forth that Appellant was not involved in the abortion procedures at the clinic. She maintained that Appellant did have a pre-signed prescription pad from Gosnell and would enter the abortion portion of the clinic, which was on the first floor, to consult with Gosnell. Appellant then would write what he told her on the pad. Moton claimed that

---

[5] Dr. Karen Feisullin testified that Cytotect is a brand name of Misoprostol, a drug used to help soften a women's cervix.

Appellant only saw patients on the second floor of the clinic, where abortions were not performed.

Steve Massof testified similarly. Like Moton, Massof had entered state and federal guilty pleas before this trial. Massof pled guilty to two counts of third-degree murder, criminal conspiracy, corrupt organizations, and conspiracy to commit corrupt organizations at the state level. He also entered a federal plea on drug charges. He confirmed Moton's testimony that Gosnell regularly manipulated ultrasounds so Gosnell could perform abortions after the fetus was twenty-four weeks old. Massof also provided that Gosnell performed abortions on women past twenty-four weeks of their pregnancy.

Massof admitted that approximately 80% of the babies that were born precipitously had visible chest movement and that Gosnell intentionally increased the dosage of Cytotec to cause precipitous births.[6] According to Massof, Gosnell taught him to use a pair of surgical scissors to snip the back of a baby's neck at the top of the spinal cord, separating the brain from the body, in essence beheading the baby, if it was born precipitously.

Massof did not implicate Appellant in these actions. Instead, he testified that she treated family practice patients and her only involvement with abortion patients was to set up ultrasounds for second trimester women

---

[6] A precipitous birth was defined at trial as the fetus coming out of the body faster than expected.

and prepare them on "dilation night." N.T., 4/4/13, at 82. However, he did acknowledge that Appellant consulted with Gosnell about her patients, and she would write reports, and issue diagnoses. Massof also testified that he provided diagnoses, wrote prescriptions from a pre-signed pad signed by Gosnell, and treated patients, although he was not a licensed doctor.[7]

Sherry West, another employee at the abortion clinic, pled guilty to third-degree murder and federal drug charges. West confirmed that babies were routinely killed after being born alive and that she and Lynda Williams administered anesthesia despite having no training. She specifically recalled observing babies moving in a toilet and saw one baby moving and heard it make a squeaking noise.[8] Additionally, West witnessed the incident involving the death of Ms. Mongar. According to West, Ms. Mongar stopped breathing during an abortion after Williams had administered anesthesia. Consistent with the other witnesses, West maintained that Appellant did not take part in the abortion procedures.

Williams confirmed West's testimony that Williams provided the drugs to Mongar before her death. Specifically, Williams testified that she administered Demerol. Mongar died from an overdose of that drug.

---

[7] Massof, like Appellant, did graduate from medical school.

[8] A maintenance worker, James Johnson, testified that in taking care of the restrooms he discovered that the toilets were sometimes clogged with parts of an aborted human's arm or leg.

Williams also admitted that she observed babies precipitating before abortion procedures were complete and would place them in a jar for Gosnell.

The Commonwealth elicited additional testimony from Elizabeth Hampton, Ashley Baldwin, Tina Baldwin, Kareema Cross, Della Mann, Mary Kingkade, Lisa Dungee, Lorraine Matijkiw, and Latosha Lewis. Hampton, who had previously pled guilty to perjury as a result of her grand jury testimony, testified that she was present when Ms. Mongar went into cardiac arrest and had provided her with Cytotec. She set forth that Appellant was not in the office at that time.[9] However, she did testify that Appellant held herself out as a licensed physician. She also referred to Massof as a doctor, and noted that Massof and Appellant had offices on the second floor of the clinic.

Ashley Baldwin began to work at the clinic in 2006, when she was a teenager. Ashley testified that on five occasions she witnessed a baby born precipitously breathing, crying, or moving. She testified that Gosnell, Massof and Williams would snip the necks of the babies. Ashley was present at work when Moton photographed one baby, and set forth that she saw the child move on the day the picture was taken. In chilling testimony, she

_____

[9] Multiple witnesses did testify that Appellant performed CPR on Ms. Mongar and Appellant did provide law enforcement with a statement indicating the same.

offered that, after she witnessed another infant move its arms, Gosnell remarked that the child could "walk me home." N.T., 4/11/13, at 30. Ashley also provided that Appellant was not involved with performing abortions, though Ashley did believe Appellant was a doctor.

Ashley's mother, Tina, worked at the front desk of the clinic between March 2002 and January 8, 2010. She pled guilty in both state and federal court before testifying in this matter. Tina stated that Appellant regularly treated patients but was not involved in the abortion practice of the clinic. According to Tina, Appellant treated patients on Wednesdays in the absence of Gosnell and wrote prescriptions when he was not around.

Kareema Cross, who had pled to a probationary sentence in federal court for conspiracy to distribute controlled substances, was a medical assistant at the clinic. She proffered that Gosnell regularly performed second trimester abortions after 24 and one-half weeks. Cross estimated that she saw Massof snip the backs of necks twenty-five to thirty times. Similarly, she observed over ten instances where the infant was breathing after being born. In addition, she set forth that she saw Gosnell snip necks over ten times. Further, she stated that she saw Moton snip a baby's neck after the baby was born precipitously while the mother was on the toilet, and Williams snipped a child whose chest was moving.

Cross was also present when Moton took the photograph of one of the children that Gosnell killed. She provided that the baby was very large, still

- 8 -

breathing, and its arms and legs were moving. Despite this fact, Gosnell snipped the baby's neck. As to Appellant, Cross offered limited testimony. Cross stated that Appellant treated patients on Mondays, Wednesdays, and Fridays on the second floor of the clinic. Cross believed Appellant was a doctor, referred patients to her, observed Appellant seeing patients when Gosnell was absent, and saw her issue prescriptions.

Della Mann testified that Appellant saw her as a patient six or seven times. Similarly, Appellant saw Mary Kingkade for an annual exam for five or six years. Lisa Dungee stated that Appellant provided her a pill during a non-surgical abortion in 2009. These witnesses each provided that they believed Appellant was a licensed doctor.

Lorraine Matijkiw was a quality assurance nurse in the Philadelphia Department of Health. She testified that she visited the clinic as part of a program that provides vaccines to children who were on Medicaid or uninsured. Matijkiw indicated that when she observed the clinic in 2008 that it was filthy and that the clinic had expired vaccines. She encountered Appellant as part of her visit and asked whether Appellant was a licensed physician. Appellant told her that she had been licensed in Delaware, which was not true, and that she had allowed her license to lapse. According to Matijkiw, Appellant stated that she helped Gosnell with medication and labs and was a patient care manager.

Latosha Lewis worked for Gosnell as a medical assistant and entered a federal guilty plea for her involvement in the clinic. Lewis' initial job was to answer the phones, take patients to the exam rooms, draw blood and check for vital signs. Eventually, she began to do ultrasounds, IVs and administer anesthesia. She stated that the clinic was not kept clean, but, after Ms. Mongar died, Gosnell instructed the staff to clean the facility to prepare for a review by the National Abortion Federation. Lewis further testified regarding patient files, which reflected that abortions were performed on women whose pregnancies were twenty-four weeks or beyond on multiple occasions.

Following the close of the Commonwealth's evidence, the court dismissed three counts of theft by deception against Appellant. The jury, after two weeks of deliberations, found Appellant guilty of two counts each of conspiracy to commit corrupt organizations and theft by deception. The jury acquitted Appellant on the charge of corrupt organizations, and four counts of theft by deception.[10] The court initially sentenced Appellant on July 15, 2013, to six to twenty-three months on house arrest to be followed by two years probation. Appellant filed a post-sentence motion on July 24, 2013. Thereafter, the court vacated the house arrest aspect of Appellant's sentence and re-sentenced Appellant to six to twenty-three months

_____

[10] The remaining charges were *nolle prossed*.

incarceration, granted immediate parole, and re-imposed the two year probationary sentence.

Appellant timely appealed. The court directed Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal on September 24, 2013. In addition, the court filed an order on October 1, 2013, which directed Appellant to file an amended concise statement with citations to the record. Appellant sought and received an extension to file the amended concise statement. Subsequently, Appellant filed an amended concise statement on October 23, 2013. Appellant now raises the following issues for our consideration.

I. Did the lower court err in denying defendant's request for severance from the co-defendant's capital murder trial when the bulk of the evidence pertaining to the co-defendant's murder charges would not have been admissible at a separate trial for the defendant and was not capable of separation by the jury?

II. Did the lower court err in denying defendant's request for a mistrial when the prosecutor engaged in prosecutorial misconduct during closing argument by stating that, "defendant's nonaction [made] her as guilty as everybody else in th[e] case. As guilty as the doctor"?

III. Did the lower court err in precluding testimony indicating that Dr. Godfried Arthur had committed conduct identical to the defendant but had not been charged by the Commonwealth?

IV. Did the lower court err in permitting Commonwealth witnesses Mary Kingcade and Lisa Dungee to testify to the contents of their medical records when they were not qualified as custodians of said records?

Appellant's brief at 3 (brackets in original).

Appellant's initial issue challenges the court's pre-trial ruling declining to sever her trial from that of the capital case of Gosnell. We consider the decision of whether to deny a motion to sever under an abuse of discretion standard. *Commonwealth v. Brookins*, 10 A.3d 1251 (Pa.Super. 2010). Appellant relies on *Brookins* in support of her position.

In *Brookins*, the Commonwealth charged the defendant with possession with intent to deliver ("PWID"), corrupt organizations, and conspiracy. The Commonwealth elected to try Brookins jointly with multiple co-defendants. These co-defendants were also charged with kidnapping and robbery of another drug dealer. There was no evidence that Brookins was involved in these crimes. This Court ruled that the court's failure to sever the cases resulted in prejudice. The *Brookins* panel noted that the evidence against Brookins' co-defendants would not have been admissible against Brookins in a separate trial. It added that the jury would not have been able to separate the evidence of the robbery and kidnapping charges from the charges against Brookins. Appellant contends that the evidence against Gosnell in this matter was far more disturbing and prejudicial than that at issue in *Brookins*. She highlights that most of the evidence against Gosnell had no bearing on the charges against her, and the murder and related abortion act evidence would not have been admissible against her in a separate trial.

The Commonwealth replies that, although "Gosnell was charged with additional and far more serious offense including murder, those distinct crimes made the evidence against him easily separable from the evidence against [Appellant.]" Commonwealth's brief at 8. It continues that because the jury was instructed that it could not consider the evidence against Gosnell in deliberating on the charges against Appellant, Appellant suffered no prejudice.

The Commonwealth notes the general proposition that joint trials are favored where co-defendants are charged with conspiracy. However, it does not provide any case law where a defendant was jointly tried with a capital defendant where that co-defendant was not implicated in the murder aspect of the case. In the Commonwealth's view, the fact that the jury acquitted Appellant of corrupt organizations and several theft charges establishes that she was not prejudiced.

Pa.R.Crim.P. 582 provides the framework for deciding severance issues. Rule 582 reads in pertinent part:

**(A) Standards**

(1) Offenses charged in separate indictments or informations may be tried together if:

(a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or

(b) the offenses charged are based on the same act or transaction.

- 13 -

(2) Defendants charged in separate indictments or informations may be tried together if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.

Pa.R.Crim.P. 582. Thus, Rule 582 governs two separate and distinct but frequently conflated scenarios. The first is the situation where the Commonwealth charges a single defendant in multiple criminal informations (or indictments in earlier cases), and seeks to join for trial the separate cases of that defendant. *See* Pa.R.Crim.P. 582(A)(1)(a)(b). The second scenario is where multiple defendants are to be jointly tried. Pa.R.Crim.P. 582(A)(2). Appellant's case falls within the latter category. The conjoining of the analyses for the separate situations, however, is the direct result of a long line of case law. Moreover, in both situations, pursuant to Pa.R.Crim.P. 583, "[t]he court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together."

The history behind Rule 582's genesis and this Court's standard of review in severance cases is both enlightening and beneficial to understanding why it was a manifest abuse of discretion not to grant severance in this case. Almost two centuries ago, in ***Withers v. Commonwealth***, 5 Serg. & Rawle 59 (Pa. 1819), the Pennsylvania Supreme Court first articulated its abuse of discretion standard in a severance case. That matter, unlike this case, involved a single defendant, Augustus Withers. Withers was charged with conspiring to cheat Benjamin

Hickman in the first indictment. In a second indictment, he was charged with conspiring to cheat William Thomas. Withers' attorney argued that, because the two offenses were distinct and did not involve the same transaction, he should not have been tried for both indictments at the same time. In contrast, the attorney for the Commonwealth argued that trying two separate offenses in separate indictments was analogous to combining multiple charges in a single indictment.

The High Court opined, "there is a strong analogy between [this case] and those in which several counts for separate and distinct offenses are included in the same indictment[.]" *Id*. at 60. It set forth, "in no case has such joinder been considered a cause of demurrer, or ground for a motion in arrest of judgment, but merely as a subject for the discretion of the court, and therefore not a matter in which error could be assigned in a superior court." *Id*. at 61.

Relying on *Withers*, this Court in *Commonwealth v. Hartman*, 31 Pa.Super. 364 (1906), addressed the situation of severance where multiple defendants were charged with the same conspiracy to violate the election laws. There, eight men were charged with "having participated in one and the same act of conspiracy to accomplish one and the same object, or, in other words, with the commission of a single crime." *Id*. at 366. The *Hartman* Court opined,

> Where two or more defendants have been jointly indicted in one bill, the right to sever them in their defense and permit separate

- 15 -

trials, upon proper showing, has been often and freely exercised by trial courts, and is beyond question. But the offense of conspiracy is so peculiar in character and so strongly does the law incline to the natural conclusion that co-conspirators should be tried together[.]

*Id*. at 367. Importantly, this statement must be read in the context of where the conspirators are not charged with separate crimes involving different criminal episodes. The **Hartman** Court added, "[w]e are not to be understood, however, as holding that in no case of conspiracy may a severance properly be allowed." *Id*. at 368. Since the conspiracy crimes charged were identical, the court ruled there was no error in not severing the case. This case, unlike **Hartman**, involves far more serious charges against one defendant.

This Court reached a similar result in **Commonwealth v. Portner**, 92 Pa.Super. 48 (1927). In **Portner**, the defendant and another individual, Harry Cohen, were charged in three indictments with possessing morphine and cocaine and in a fourth indictment with conspiracy to sell, deliver, and distribute those drugs. Thus, there were no separate and distinguishable charges as in the present case. The **Portner** Court ruled,

The offenses were misdemeanors of the same character committed in succession by the same defendants in the same circumstances, in the presence of the same parties. All of the transactions could have been introduced in the first indictment tried to show knowledge and intent and no advantage should have resulted to the defendant by trials before separate juries.

*Id*. at 52. Again, the joint trial involving a conspiracy did not implicate offenses for which one of the defendants was not charged with or implicated.

*See also Commonwealth v. Weiner and Zvon*, 25 A.2d 844, 848 (Pa.Super. 1942). In accord with both *Hartman* and *Portner* is *Commonwealth v. McCord*, 176 A. 834 (Pa.Super. 1935). McCord and J.H. Waggy were both charged with identical crimes, specifically, assault and battery, aggravated assault and battery, operating a motor vehicle on the public highways while under the influence of intoxicating liquor, failing to stop at the scene of an accident, and involuntary manslaughter. The *McCord* Court collected cases on the issue of severance and reasoned, "There, as here, the offenses were charged to have been committed by all of the defendants at the same time and place." *Id*. at 835. The Court continued,

> The true rule would now appear to be that just as in cases where a defendant is charged in one indictment by separate counts with different offenses, or where one defendant is charged in separate indictments with different offenses, so likewise where two defendants are indicted for the same misdemeanor growing out of the same matters and circumstances so related that the proofs received in one would be competent in the other, even though the defendants demand separate trials, whether either will be prejudiced by a joint trial and they are therefore entitled to a severance is a matter for the trial court to determine in the exercise of a sound discretion[.]

*Id*. at 836. The crux of the rationale in McCord focused on the fact that each defendant was charged for conduct arising out of the same circumstance. This is not the case herein.

Indeed, the Superior Court in *McCord* distinguished its earlier case, *Commonwealth v. Schmidheiser*, 169 A. 572 (Pa.Super. 1933). In

*Schmidheiser*, the Court ruled that it was error not to sever the defendant's case from several co-defendants. The defendant, George Nahm, was charged with nine counts of embezzlement and fraudulent conversion. An indictment also charged Fred Schmidheiser, Chrisitian A. Fisher, Harry A. Rau, August Nahm, Charles B. Moore with the same crimes. These men all worked for the same building association.

The Commonwealth also joined for trial Alexander Robinson. Robinson had been charged in three separate indictments. Robinson did not work for the building association, but instead was the vice president and treasurer of the Northwestern Trust Company. Robinson was alleged to have aided and abetted the other defendants in one indictment.

The *Schmidheiser* Court ruled that the joinder of Robinson with George Nahm was improper. In doing so the Court reasoned,

> We agree with the statement of the trial judge, in his opinion refusing a new trial, that evidence of many of these transactions would have been admissible against appellant if the jury had been sworn only as to the issues arising under the indictment at No. 1642, but it is also frankly conceded that "evidence was received in connection with the indictment charging Robinson with mis-application of the funds of Northwestern Trust Company which had no bearing upon the guilt or innocence of defendant Nahm." It is contended, however, that appellant was not prejudiced by this evidence because the trial judge summarized it separately for the jurors and instructed them to disregard it when considering the charges against appellant and his co-defendants. Whether they did so can only be conjectured.

*Id*. at 574. Since the evidence against Robinson was not connected with Nahm, it was improper not to sever the case. Similarly, the grisly and

- 18 -

inflammatory evidence of Gosnell's murder and abortion crimes was not related to the charges against Appellant.

In **Commonwealth v. Quinn**, 19 A.2d 526 (Pa.Super. 1941), denial of severance was upheld in a case involving three individuals: a magistrate, Quinn, and Dominick Litz. The charges against Quinn and Litz were larceny, fraudulent conversion, blackmail, extortion, and conspiracy. This Court held that the "testimony showed a general course of conduct pursued by Quinn in conjunction with Litz, and all tending to the same general end. No matters were presented to the jury in which the appellant Quinn was not directly charged[.]" **Id**. at 529. Thus, contrary to this case, the evidence against both defendants was admissible against each.

We reached a similar result in **Commonwealth v. Mulroy**, 36 A.2d 337 (Pa.Super. 1944). There, the defendant was charged with pandering and acceptance of bawd money in relation to the running of a house of prostitution. The madam, Beatrice Mello, and a prostitute, Helen Welker, were tried with Mulroy. In rejecting Mulroy's challenge to the court's denial of severance, this Court concluded,

> All of the evidence against the Mello woman and the Welker girl was relevant and material in the trial of this defendant, and most of the evidence in his case was relevant and material against them, especially, the Mello woman. He has no ground of complaint that some of the evidence against him may not have been relevant and material in their cases. They, only, could complain of that, and they have not done so.

*Id*. at 340.  As in the prior cases, severance was not warranted for Mulroy because the evidence against the other defendants was admissible against him.  Interestingly, however, the court noted that the other defendants could have complained of evidence against Mulroy that was not material to their case.

Our Supreme Court again spoke on issues of severance in ***Commonwealth v. Kloiber***, 106 A.2d 820 (Pa. 1954).  There, the Commonwealth elected to jointly try Stephen and William Kloiber for their involvement in a robbery.  "The first count against Stephen was one of armed robbery; the first count against William was one of robbery with accomplice; the other four counts, charging robbery, assault with intent to rob, larceny and receiving stolen goods, were identical."  *Id*. at 822.  Citing both ***Mulroy***, ***supra***, and ***Quinn***, ***supra***, the High Court ruled, "Especially is a joint trial permissible, if not advisable, when the crimes charged grew out of the same acts and much of the same evidence is necessary or applicable to both defendants[.]"  *Id*. at 823.  Accordingly, the Court affirmed the denial of severance.

In contrast, in ***Commonwealth v. Belgrave***, 285 A.2d 448 (Pa. 1971), the Pennsylvania Supreme Court ruled that it was error not to sever the defendants' cases.  The ***Belgrave*** case involved a scrum at a high school football game after some fans did not stand during the National Anthem.  Three fans were assaulted at half-time and a high school band member was

attacked after the game. Sixteen individuals were arrested. They were indicted for riot, inciting a riot, public nuisance, common law nuisance, obstructing a public highway, conspiracy and other charges. Only five of the spectators were charged with assaulting the band member and one person was indicted for the attack on the other three fans. Ultimately, eight of the individuals entered guilty pleas during the trial.

In reversing, the **Belgrave** Court opined, "Besides the very nature of these two assaults, the amount of evidence introduced by the Commonwealth certainly accentuated these incidents in the jury's mind." **Id**. at 450. It noted that police identification testimony linked all of the individuals together despite the distinct episodes. The Court suggested that "proper instructions might have clarified the jury's thinking" but found that the jury instructions therein were improper in one respect. **Id**. Quoting from a dissenting judge from this Court's earlier decision in the matter, the Supreme Court stated, "the complexity of the evidence and the extreme variation in the amount and type of evidence against the various defendants required marshalling the evidence against and for each defendant separately." **Id**.

Subsequently, this Court and the Pennsylvania Supreme Court addressed severance of multiple defendants in **Commonwealth v. Tolassi**, 392 A.2d 750 (Pa.Super. 1978), *affirmed*, 413 A.2d 1003 (Pa. 1980). The defendants in **Tolassi** were union members charged with destroying a

construction site. The Commonwealth charged twenty-three individuals. Fourteen were tried jointly in the underlying *Tolassi* case, and eleven convicted. All of the *Tolassi* defendants were charged with identical crimes. This Court identified three factors to consider in determining whether to grant or deny severance.

> Whether the number of defendants or the complexity of the evidence as to the several defendants is such that the trier of fact probably will be unable to distinguish the evidence and apply the law intelligently as to the charges against each defendant; (2) Whether evidence not admissible against all the defendants probably will be considered against a defendant notwithstanding admonitory instructions; and (3) Whether there are antagonistic defenses.

*Tolassi*, 392 A.2d at 753. The Superior Court reasoned that all of the evidence was admissible against each defendant and no antagonistic defenses were presented. It added that, "proof of the corpus delicti of the various crimes charged in this case was identical for all the defendants." *Id*. On appeal, the Pennsylvania Supreme Court concluded similarly and distinguished its earlier *Belgrave* decision. It relied principally on the fact that each defendant was charged with identical crimes and all of the offenses "arose from the same criminal activity[.]" *Tolassi*, 413 A.2d at 1007. In addition, the Supreme Court noted that three defendants were acquitted of all charges and another three were only convicted of two of the crimes charged. Here, the charges against Appellant did not arise from the same criminal activity as the overwhelming majority of criminal charges against

Gosnell, nor was proof of Gosnell's murder and abortion crimes identical to the proof for Appellant's lesser offenses.

In **Commonwealth v. Patterson**, 546 A.2d 596 (Pa. 1988), the Pennsylvania Supreme Court addressed whether severance was warranted where the "co-defendants were faced with identical rape, robbery, burglary, aggravated assault, and conspiracy charges based on the same incident and involving the same evidence, but where one co-defendant was also charged with witness intimidation." **Id**. at 597. This court had earlier reversed the defendant's conviction on the grounds that the witness intimidation evidence against his co-defendant was not admissible against him and that the court's cautionary instruction was inadequate.

The **Patterson** Court began by noting that the case was "not a typical joinder/severance case." **Id**. at 599. The Court continued, "There are generally two types of cases dealing with the issue of consolidation. One type concerns the consolidation of different offenses involving the same defendant. The other type concerns the consolidation of different defendants involved in the same offense." **Id**. at 600.

The Commonwealth averred therein that "the evidence against both defendants was almost identical, and the only piece of evidence applying solely to the co-defendant was clearly capable of separation by the jury and easily compartmentalized[.]" The **Patterson** Court first recognized that a plurality decision had earlier held that in determining whether severance is

- 23 -

appropriate, the courts look to whether "'the evidence of each of the particular crimes would not have been admissible in a separate trial for the other,' or 'whether the evidence is capable of separation by the jury so that the danger of confusion is not present[.]'" *Id*. at 600 (quoting *Commonwealth v. Peterson*, 307 A.2d 264 (Pa. 1973) (plurality) (footnotes omitted).

The Supreme Court found that the defendant suffered no prejudice, and highlighted that the cautionary instructions in the case sufficed to remove any prejudice to the defendant, who was not charged with the witness intimidation count. Unlike this case, we note that in *Patterson*, *supra*, the Commonwealth charged the defendants with the identical serious rape offenses and the witness intimidation count against one defendant arose directly out of the rape charges. Appellant was not charged with the identical most serious offenses as Gosnell, nor did the counts against her arise from Gosnell's murder and abortion crimes.

The Pennsylvania Supreme Court has also declined to rule that severance was required in capital cases where the co-defendants were all charged with murder. In *Commonwealth v. Chester*, 587 A.2d 1367 (Pa. 1991), the defendant and his co-defendant, Richard Laird, were both jointly tried for capital murder. The *Chester* Court rejected Chester's severance challenge. The Court reasoned that both men were charged with conspiracy in relation to the death of Anthony Milano and that the mere claim of

antagonistic defenses did not warrant a separate trial. **See also Commonwealth v. Lambert**, 603 A.2d 568 (Pa. 1992) (Lambert and co-defendant Bruce Reese both charged with murder, robbery, criminal conspiracy, and weapons violations); **Commonwealth v. Marinelli**, 690 A.2d 203 (Pa. 1997); **Commonwealth v. Uderra**, 706 A.2d 334 (Pa. 1998); **Commonwealth v. Williams**, 720 A.2d 679 (Pa. 1998); **Commonwealth v. King**, 721 A.2d 763, 771 (Pa. 1998) (in case where both co-defendants were charged with murder the Court reasoned, "the following factors militated in favor of a joint trial: Appellants were charged with conspiracy; the majority of the crimes charged were the same; the circumstances giving rise to the crimes were identical with respect to both defendants; and the witnesses necessary to prove the crimes were the same."); **Commonwealth v. Lopez**, 739 A.2d 485 (Pa. 1999); **Commonwealth v. Rivera**, 773 A.2d 131 (Pa. 2001);[11] **Commonwealth v. Housman**, 986 A.2d 822 (Pa. 2009); **Commonwealth v. Birdsong**, 24 A.3d 319 (Pa. 2011); **Commonwealth v. Presbury**, 665 A.2d 825 (Pa.Super. 1995); **Commonwealth v. Cull**, 688 A.2d 1191 (Pa.Super. 1997).

---

[11] The trial court in its Pa.R.A.P. 1925(a) opinion relied on **Rivera**, **King**, **Chester**, **Lopez**, **Lambert**, and **Williams**. In doing so it did not mention the critical distinction that the co-defendants charged in those matters were all also charged with murder. Hence, we find reliance on those cases unpersuasive.

This case, of course, does not involve two defendants both charged with murder. None of the cases relied upon by the Commonwealth or the trial court in discussing that joint trials for co-conspirators are favored involves a proceeding where one defendant was charged with unrelated murders, indeed capital murder, and the other individual was not also charged with either murder or conspiracy to commit murder. Pointedly, the Commonwealth has failed to supply a single case where a person charged capitally was tried jointly with another person who had no involvement in the *res gestae* of the murder. ***See e.g. Commonwealth v. Scarborough***, 460 A.2d 310 (Pa.Super. 1983); ***Chester***, ***supra***; ***Lambert***, ***supra***; ***Marinelli***, ***supra***; ***Williams***, ***supra***; ***King***, ***supra***; ***Rivera***, ***supra***; ***Housman***, ***supra***.

Further, we have been unable to uncover a remotely analogous case where one defendant was jointly tried with a co-defendant, whom the Commonwealth charged with a host of far more serious offenses, and the offenses that were the same or similar were entirely unrelated to the more serious crimes. Importantly, unlike the cases referenced above, the overwhelming majority of the crimes charged against Gosnell and Appellant were not identical, nor were the circumstances giving rise to Gosnell's crimes identical to Appellant's criminal behavior. The overlap between Gosnell's corrupt organizations charge and the counts against Appellant, while undeniable, is paltry in comparison to the sheer amount of evidence against

Gosnell that had no bearing on the charges against Appellant. This case took place over the course of a month, and the vast majority of evidence focused on Gosnell's horrendous actions.[12] We find the evidence in this case far more prejudicial than that at issue in **Brookins**, **supra**.

Here, the prosecutor himself could not separate in his own mind the evidence against Gosnell and Appellant. In his closing summation, the prosecutor set forth,

> I want to talk generally about Eileen O'Neil because one of the things that should strike all of us is, what kind of person that's got medical training, can work in a facility for eight or ten years, and not say a word to anybody about it?
>
> She knew what was going on in that place. She saw the conditions, but instead she hid upstairs in her office with her head in the sand. She's not fit to be a doctor. How can your standards—what kind of doctor I would suggest to you would get degree in the '90s and have no license? Makes you wonder what's up with her.
>
> I would suggest to you that her nonaction makes her as guilty as everybody else in this case—as guilty as the doctor, I'm sorry.

N.T., 4/29/13, at 336. Although the jury was instructed to disregard this argument, it illustrates the difficulty in separating the evidence of Gosnell's actions when considering the evidence against his employee, Appellant.

---

[12] We note that in addition to the prejudicial nature of the evidence, Appellant was put to the added expense of defending this case for an extended period of time that would have been unnecessary if tried separately. Thus, counsel and the defendant sat through a two month trial, much of which did not relate to the charges against her.

Frankly, if the evidence against Gosnell was not the type of emotionally charged evidence that was so prejudicial and inflammatory as to warrant a separate trial where his co-defendant was not implicated in the murder charges, it is difficult to conceive a scenario where a person could show such prejudice.

Furthermore, the fact that the court instructed the jury to not consider the evidence against Gosnell in deliberating on Appellant's charges does not preclude a finding of prejudice. Indeed, if jury instructions could cure any resulting prejudice in a case such as this, there would be little grounds for ever severing co-defendants for trial. In virtually every jointly-tried case, the court can and does instruct the jury that it cannot consider exclusive evidence against one defendant as evidence that a co-defendant is guilty. The Commonwealth's position would largely eviscerate Rule 583 since no prejudice could be maintained as long as a jury was so instructed.

We find that this case was one of the exceptionally rare instances where the evidence against one co-defendant was so inflammatory and inherently prejudicial that jury instructions were insufficient. That Appellant was acquitted of several offenses does not alter our conclusion. It is mere conjecture whether the jury carefully separated the evidence or merely

issued a compromise verdict after two weeks of deliberating. ***Cf. Schmidheiser***, ***supra***.[13]

The evidence against Gosnell was shocking and highly disturbing. It is difficult to even read the cold record without having a visceral reaction to what transpired in Gosnell's abortion clinic. This overwhelming and appalling evidence of the killing of live born babies certainly would not have been admissible in a trial solely against Appellant. The prosecutor himself, a trained legal professional, could not separate the evidence against Gosnell and Appellant. Permeating throughout this trial was the idea that Appellant could not have been so blind and naïve not to have noticed what was occurring one floor below. The trial court during sentencing even remarked, "The one aspect of Ms. O'Neill's case that does stun me is that someone with so much education could stay at a place like this, could participate in any way and not be shocked to the extent that they would either leave or call the authorities." N.T. 7/15/13, at 58. The court continued, stating, that in going "to trial in a case that carries the horrors of the Gosnell trial, a lot of that emotion is going to come your way, a lot of that anger." ***Id***. at 59.

None of the cases supplied by the trial court or the Commonwealth supports the conclusion that a joint trial is appropriate for a defendant charged with multiple homicides and a person charged with crimes wholly

---

[13] The jury did indicate prior to reaching its verdict that it was hung on two counts.

unrelated to those homicides. Accordingly, we find that the trial court abused its discretion in failing to sever Appellant's case from the capital murder trial of Kermit Gosnell. As we have found that Appellant is entitled to relief on her first issue, we need not reach her remaining contentions.

Judgment of sentence reversed. Case remanded for a new trial. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/20/2015