J-S19020-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TROY EMANUEL BAKER, | |
| Appellant | No. 454 MDA 2016 |

Appeal from the Judgment of Sentence Entered February 19, 2016
In the Court of Common Pleas of Dauphin County
Criminal Division at No(s):
CP-22-CR-0000034-2014
CP-22-CR-0002151-2014

BEFORE: GANTMAN, P.J., BENDER, P.J.E., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED AUGUST 01, 2017**

Appellant, Troy Emanuel Baker, appeals from the judgment of sentence of an aggregate term of 6 years' and 8 months' to 15 years' incarceration, following his conviction for four burglary and conspiracy counts. After careful review, we affirm.

The trial court summarized the facts adduced at trial as follows:

> At docket 34-CR-2014, [Appellant] was found not guilty of Count 1 (Colonial Lounge Burglary), Count 2 (L&N Beverage Burglary), Count 4 (Colonial Country Club Burglary), Count 5 (Super 7 Mart Burglary),[3] and Counts 8, 9, 11, and 12 (Conspiracy counts). In regards to these burglaries, the Commonwealth introduced evidence that showed how the burglaries were committed (in order to establish *modus operandi*) and what was taken from each location. The

_____

[*] Former Justice specially assigned to the Superior Court.

Commonwealth also introduced a PowerPoint presentation that generally showed the location of each burglary and pictures from the scene of the incident. As [Appellant] was found not guilty of the above-mentioned burglaries, this [c]ourt will briefly discuss those that [Appellant] was found guilty of below.

   [3] [Appellant] was also found not guilty of the conspiracy to
   commit burglary in regards to these counts.

### Count 3 – Barr's Exxon Interstate (Gas Station) Burglary (Pine Grove, Pennsylvania):[4]

[Appellant] was found guilty of the Barr's Exxon Interstate burglary at docket 34-CR-2014, Count 3. The incident occurred after the gas station closed on June 7, 2013 (into June 8, 2013). Larry Barr, owner of Barr's Exxon Interstate, testified that cash and a DVD player were taken. Trooper Jordan Tuttle, a Pennsylvania State Trooper who was first to arrive on the scene, introduced a PowerPoint presentation that described the layout of the property, the wires that were cut, the window damage, the door damage, how the ATM looked, the cash register, the damage to the safe, etc. Trooper Tuttle also testified that this burglary was very distinct in that it was well-executed and organized. The Commonwealth's final witness in regards to the Barr's [Exxon] Interstate burglary was Trooper Robert Kluge who was asked to follow up on any leads leading from the investigation. The Commonwealth also presented testimony from an employee of Barr's Interstate and the owner who testified to what they saw in regards to the burglary.

   [4] Barr's Exxon Interstate is located around mile marker
   100 on Interstate 81 near the Pine Grove exit in Schuylkill
   County. The burglary took place sometime after the gas
   station closed on June 7, 2013 into June 8, 2013.

### Count 6 - Blue Ridge Country Club (Harrisburg, Pennsylvania):

[Appellant] was found guilty of the Blue Ridge Country Club burglary at docket 34-CR-2014, Count 6. The incident took place in August of 2013. Wade Boulder, employed as a controller at the Blue Ridge Country Club, testified that $3,500 in cash was taken at the time of the burglary. Officer Bryan Ryder, of the Lower Paxton Township Police, was the first to arrive on scene for the Blue Ridge incident and noticed that numerous wires were cut on an outside pole where the alarm system was hooked up. Investigator McPhillips discussed the Blue Ridge

Country Club burglary.[5] As later testimony would reveal, the three (3) defendants, all of whom lived in the Baltimore-Washington area, were followed into Pennsylvania by detectives from Maryland on the night of the Blue Ridge caper as part of a police investigation in that state.

[5] The Commonwealth introduced another PowerPoint (Commonwealth's Exhibit 426) which showed the scene of the Blue Ridge Country Club burglary.

Count 7 - Thorndale Exxon Gas Station Burglary (Thorndale, Chester County, Pennsylvania):

[Appellant] was found guilty of the Thorndale Exxon Gas Station burglary at docket 34-CR-2014, Count 7. The incident occurred the night of August 26, 2013 into August 27, 2013. Rakesh Kumar ("Rocky"), part owner of Thorndale Exxon Gas Station, testified that a DVR system, cartons of cigarettes, cigars, and $7,000 to $8,000 in cash was taken during the burglary. Detective James Lippolis, a Detective in the Cain Township Police Department, Chester County, processed the scene and through him, the Commonwealth introduced another PowerPoint Presentation.[6] This PowerPoint presentation provided a walk-through of the Thorndale Exxon Gas Station Burglary and provided photographs of the following: location, the gas station itself, damaged front door, damaged ATM machine, ATM Cash Box,[7] lottery machine register, cash register (with wires cut), pictures of the safe, the alarm panel system,[8] and wires from where the DVR system would have been.

[6] The Commonwealth introduced said PowerPoint presentation as Commonwealth's Exhibit 505.

[7] The ATM cash box was admitted into evidence.

[8] The alarm panel system was admitted as Commonwealth's Exhibit 564.

Count 1 - Shell at Top of the 80s Gas Station and Convenience Store Burglary (located at 218, Route 93, Hazleton, PA):

[Appellant] was found guilty of the Shell at the Top of the 80s Gas Station burglary at docket 2151-CR-2014, Count 1. The incident occurred on the night of September 3, 2013 into September 4, 2013. Jihad Abdulrahman, owner of the gas station, testified that cigarettes and cigars were taken along with

an estimated $5,000 to $6,000 in cash on the night of the burglary.[9] The Commonwealth called Corporal Mark Dotter, of the Pennsylvania State Police, to testify to the investigation and car chase that took place following the break-in. Corporal Dotter testified that he activated his emergency lights and sirens to pull over the Yukon, which was the getaway vehicle used by the burglars, including … Appellant. The Commonwealth proceeded to call Detective Joseph Pugliese, who at the time of the burglaries was a Detective in the Howard County Police Department and a member of the ROPE unit. Detective Pugliese first testified as to the Blue Ridge Country Club incident and his surveillance and monitoring of a white work van and a Yukon (known to be driven by [Appellant]) around 2:50 a.m. in the morning on the night of the incident. Next, Detective Pugliese testified to the incident that occurred during the Shell at Top of the 80s Gas Station burglary. Finally, Detective Pugliese testified that he helped with the stop following the chase.

[9] Mr. Abdulrahman also testified that his satellite system for the credit card machine was taken.

Other evidence was introduced linking the Defendant and his co-defendants to the charged burglaries.

Cindy Skylight Liquor Store Burglary (Elkridge. Maryland):[10]

Police Officer John Mooney of the Howard County Police Department testified to the burglary that occurred on August 12, 2013 at Cindy Skylight Liquor Store. Officer Mooney was the first officer to arrive on the scene and made sure the scene was secure. Officer Mooney discovered a purse[11] (inside the purse was co-defendant[] Cornell Anthony Cole's driver's license) l[]ying in the grass. Once inside, Officer Mooney noticed that the alarm keypad was ripped off the wall and the safe was tampered with and that the outside electrical phone box was damaged and the wires were cut. Detective Nathan Guilfoyle, the lead investigator, testified that the proactive enforcement unit (ROPE)[12] got involved and contact was eventually made with Detective Glucksman. The Commonwealth also introduced Commonwealth's Exhibit 425 which was a search warrant for the installation of an electronic tracking devise for a 2003 GMC Yukon owned by [Appellant]. Detective Guilfoyle also testified that they had also obtained a search warrant (although never executed) for a 2009 Ford E350 work van owned by Cornell Cole. Trooper Christopher Plumadore, employed by the Maryland State

Police, and Jon Blevit, a Police Officer in Whitpain Township, Montgomery County, Pa both testified to prior interactions with the defendant(s). A Stipulation was read to the jury in regards to the 2009 incident (Trooper Plumadore), the 2010 incident (Officer Blevit), and Cindy Skylight Liquor Store.[13]

[10] [Appellant] was not charged with this burglary.

[11] Introduced as Commonwealth's Exhibit 361A.

[12] This was a plain-clothes type of unit who drive unmarked vehicles.

[13] This Stipulation included that any charges stemming from the 2009 incident were dismissed and expunged, no charges were brought from the 2010 incident, and any charges from Cindy Skylights were withdrawn and dismissed.

## Cell Phone Records:

The Commonwealth called Special Agent Richard Fennern to testify in regards to historical cellular technology. Special Agent Fennern went through his background, described CAST (cell-phone related analysis), as well as his training and experience, and gave background on what exactly is historical cellular technology (can determine a phone's location based on the cell tower's make-up). Special Agent Fennern can look at phone records and based on when there is phone activity, can give a general location of the phone during the call. The Commonwealth introduced a PowerPoint of Special Agent Fennern's conclusions in regards to his research. The PowerPoint presented showed the various locations and times of the individual phone records of Mr. Cole, [Appellant], and Mr. Smith.[14]

[14] In regards to the phone number of Mr. Smith, an objection was made not to use his name in reference to a particular phone number. Said objection was overruled as [Detective] Kreller had discussed the link between the phone number provided and Mr. Smith.

## GPS Tracking:

The Commonwealth called Sergeant Sarah Kayser, a member of the Howard County Police Department, to testify in regards to GPS surveillance in this case.[15] Court Orders had

been obtained in order to do a live GPS tracking for the cell phones of [Appellant], Mr. Cole, and Mr. Smith.

[15] Sergeant Kayser was a member on the ROPE team (previously mentioned above).

Following the testimony of Sergeant Kayser, [Detective] Kreller was recalled to testify. [Detective] Kreller indicated that he was the lead investigator with the ROPE team. [Detective] Kreller went on to testify about the Blue Ridge Country Club incident.[16] In regards to the Thorndale Exxon Burglary, [Detective] Kreller explained that on the night of August 26, 2013 into August 27, 2013, he followed the suspects up to the Mason-Dixon Line (but stayed in Maryland). [Detective] Kreller also testified to the burglary that took place in Hazleton, PA.[17] At this point, the ROPE team was working with Detective Glucksman here in Pennsylvania (it was more of a joint venture and additional resources were available to the ROPE team).

[16] [Detective] Kreller was actually on the scene and was part of the ROPE team maintaining visual surveillance of the suspects.

[17] This occurred on the night of September 3rd, 2013 into the night of September 4th, 2013 and eventually led to the arrest of the suspects.

The Commonwealth's final two witnesses were Nicholas Plumley, a forensic scientist with the Pennsylvania State Police Bureau of Forensic Sciences, who testified as to evidence collected and how it related to each burglary and Detective Glucksman introduced the mobile vehicle report system videos of the chase and the arrest of the suspects.

Trial Court Opinion (TCO), 9/21/16, at 3-8 (citations to the notes of testimony omitted).

The trial court also provided the procedural history leading to this appeal as follows:

Following a jury trial that commenced on January 22, 2016 and concluded on February 5, 2016, Appellant was found guilty of burglary and conspiracy for four of the incidents and acquitted of

the other counts.   He was sentenced on the above captioned dockets as follows:

Docket No. 34-CR-2014: At Count 3 (Barr's Exxon Burglary), [Appellant] was sentenced to a term of incarceration of not less than 16 months no[r] more than 36 months.   At Count 6 (Blue Ridge Country Club Burglary), [Appellant] was sentenced to a term of incarceration of not less than 16 months nor more than 36 months running consecutively to Count 3.   At Count 7 (Thorndale Exxon Burglary), [Appellant] was sentenced to a term of incarceration of not less than 16 months nor more than 36 months running consecutively to Count 6.   At Count 10 (Barr's Exxon Burglary - Conspiracy), [Appellant] was sentenced to a term of incarceration of not less than 16 months nor more than 36 months running consecutively to Count 7.   At Count 13 (Blue Ridge Country Club Burglary - Conspiracy), [Appellant] was sentenced to a period of incarceration for a term of not less than 16 months nor more than 36 months running concurrently to Count 6.   At Count 14 (Thorndale Exxon Burglary - Conspiracy), [Appellant] was sentenced to a term of incarceration of not less than 16 months nor more than 36 months running concurrently to Count 13.

Docket No. 2151-CR-2014: At Count 1 (Shell Gas Station Burglary), [Appellant] was sentenced to a term of incarceration of not less than 16 months nor more than 36 months running consecutively to Count 10 on Docket No. 34-CR-2014.   At Count 2 (Shell Gas Station Burglary - Conspiracy), [Appellant] was sentenced to a term of incarceration of not less than 16 months nor more than 36 months to run concurrently with Count 1. [Appellant] was entitled to time credit from September 14, 2013 to August 17, 2015, 23 months and 13 days.

[Appellant]'s total sentence was a period of incarceration not less than 80 months['] nor more than 180 months[' incarceration].

A timely notice of appeal was filed on March 17, 2016.   In compliance with this [c]ourt's Order directing Appellant to file a [Pa.R.A.P. 1925(b) statement], Appellant filed a [Rule 1925(b) statement] on April 25, 2016.

*Id.* at 1-2.  The trial court issued its Rule 1925(a) opinion on September 21, 2016.

Appellant now presents the following questions for our review:

I. Did not the court err in denying [Appellant]'s motion to sever his case from those of his co-defendants pursuant to Pa.R.Crim.P. 583 when he suffered prejudice as a result of the consolidation?

II. Did not the court err in denying [Appellant]'s motion to suppress based on the illegal searches performed by Maryland Police Officers in the Commonwealth of Pennsylvania outside of any permissive authority described in 42 Pa.C.S. §§ 8921-8924 (regarding interstate hot pursuit) and 42 Pa.C.S. §§ 8951-8954 (regarding municipal police jurisdiction)?

III. Did not the court err in denying [Appellant]'s motion[,] based on the standard of *Frye v. United States*, 298 F. 1013 (1923)[,] to exclude expert testimony of historical cell tower data acquired from [Appellant]'s cell phone providers?

IV. Did not the court err in permitting the Commonwealth to introduce prior-bad-act evidence detailing activities of the three defendants, or subsets of them, when such activities were remote from the events on trial and when such activities did not result in any criminal convictions?

V. Did not the court err in denying [Appellant]'s motion for mistrial based upon the Commonwealth's exceeding the bounds of the pretrial ruling permitting it to introduce prior-bad-act evidence?

Appellant's Brief at 7-8.

Appellant's first claim concerns the issue of severance/joinder. Appellant was subjected to a joint trial with co-defendants Cole and Smith, after his pretrial motion to sever was denied. Appellant asserts that joinder was improper under the governing standard, and/or that his motion for severance by party should have been granted.

"We consider the decision of whether to deny a motion to sever under an abuse of discretion standard." ***Commonwealth v. O'Neil***, 108 A.3d 900, 905 (Pa. Super. 2015). "The court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together." Pa.R.Crim.P. 583.

> "Under Rule 583, the prejudice the defendant suffers due to the joinder must be greater than the general prejudice any defendant suffers when the Commonwealth's evidence links him to a crime." ***Commonwealth v. Dozzo***, 991 A.2d 898, 902 (Pa. Super. 2010) (citation omitted), *appeal denied*, 607 Pa. 709, 5 A.3d 818 (2010).
>
>> The prejudice of which Rule 583 speaks is, rather, that which would occur if the evidence tended to convict the appellant only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence. Additionally, the admission of relevant evidence connecting a defendant to the crimes charged is a natural consequence of a criminal trial, and it is not grounds for severance by itself.
>
> ***Id.*** (quoting ***Commonwealth v. Lauro***, 819 A.2d 100, 107 (Pa. Super. 2003), *appeal denied*, 574 Pa. 752, 830 A.2d 975 (2003)).

***Commonwealth v. Richard***, 150 A.3d 504, 509–10 (Pa. Super. 2016).

Moreover, "when a conspiracy is alleged the defendants should usually be tried together." ***Commonwealth v. Tolassi***, 392 A.2d 750, 753 (Pa. Super. 1978). As our Supreme Court further explained in ***Commonwealth v. Housman***, 986 A.2d 822, 834 (Pa. 2009), "joint trials are preferred where conspiracy is charged. [Nevertheless, s]everance may be proper

- 9 -

where a party can establish the co-defendants' defenses are so antagonistic that a joint trial would result in prejudice. … However, the party seeking severance must present more than a mere assertion of antagonism[.]" In determining whether a defendant can overcome preference for joint trials of co-conspirators, we consider the following three factors:

> (1) Whether the number of defendants or the complexity of the evidence as to the several defendants is such that the trier of fact probably will be unable to distinguish the evidence and apply the law intelligently as to the charges against each defendant; (2) Whether evidence not admissible against all the defendants probably will be considered against a defendant notwithstanding admonitory instructions; and (3) Whether there are antagonistic defenses.

*Tolassi*, 392 A.2d at 753.

Instantly, Appellant alleges that there was a "danger" that the jury would be incapable of distinguishing evidence pertaining to the prior-bad-acts of his co-defendants, "despite any admonitory warnings." Appellant's Brief at 28. Specifically, Appellant was not involved in a 2010 vehicle stop involving his co-defendants, Cole and Smith, who were stopped in Montgomery County, Pennsylvania. During that stop, police discovered "various tools, clothing[,] and equipment that the Commonwealth characterized as instruments for committing burglaries." *Id.* at 18. Appellant claims "[t]here is no better proof of that fact tha[n] the comments of the attorney during his closing argument. Despite his long-term familiarity with the evidence, he grouped all three defendants together in his references to the … 2010[] incident." *Id.* at 38-39.

- 10 -

The trial court justified its joinder/severance decision, stating:

In the instant case, the burglaries took place over an approximately five (5) month period within and around central Pennsylvania. There are numerous factors weighed in favor of joinder, including the fact that the charges against the multiple defendants arose from the same course of events. In addition, relevant evidence (i.e. the surveillance and tracking of the multiple defendants, the way each burglary was carried out, the time of occurrence of each burglary, etc.) of each crime would be admissible as relevant evidence of the other charged crimes. Furthermore, the evidence against the multiple defendants (including Appellant) formed part of the "natural development" of the facts and history of Appellant's case. ***Commonwealth v. Childress***, 452 Pa.Super. 37, 680 A.2d 1184, 1188 (1996) (evidence of crimes other than the one in question may be admitted where such evidence is part of the history of the case and forms part of the natural development of the facts).

With respect to considering any potential prejudice, this [c]ourt finds that the jury was capable of separation of the individual defendants/crimes because the victims and witnesses for each were different and presented that way during the trial. The Commonwealth's testimony on the cellular phone data and other relevant evidence was presented separately by date and location of each incident. Finally, it is clear that the jury appropriately received and parsed the evidence as it rendered guilty and not guilty verdicts accordingly at the end of the trial. In this [c]ourt's weighing of the probative value of the common evidence, the possible prejudicial value of permitting the joinder of several defendants and trials of the individual offenses as against the interests of judicial economy, it properly exercised its discretion by denying Appellant's motion for severance on the issues presented at trial and … Appellant's motion to sever the defendant from trial with his co-defendants.

TCO at 10-11 (footnote omitted).

We agree with the court's analysis, especially in light of the presumption that co-conspirators should be tried together. ***See Houseman***, ***supra***. Furthermore, we are wholly unconvinced that the

inclusion of evidence regarding a single prior bad act by Appellant's co-conspirators, which did not involve Appellant, could not be easily separated by the jury, merely because of an isolated error by a prosecutor. Moreover, in his brief, Appellant provides no authority which supports that view. Indeed, we agree with the Commonwealth that Appellant has simply failed to demonstrate that the prejudice arising from Appellant's joinder with his co-conspirators, under these circumstances, "presents substantially more prejudice than exist[s] in any joinder case...." Commonwealth's Brief at 11. Accordingly, we conclude that Appellant's first claim lacks merit.

Next, Appellant presents a two-part claim that the trial court erred in denying his motion to suppress evidence presented by the Maryland police officers, evidence which he asserts was collected without any permissible authority under either 1) the statutes governing interstate hot pursuit, 42 Pa.C.S. § 8922 *et. seq.*; or 2) the Municipal Police Jurisdiction Act (MPJA), 42 Pa.C.S. § 8953 *et. seq.*

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an

- 12 -

appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. McAdoo*, 46 A.3d 781, 783-84 (Pa. Super. 2012) (quoting *Commonwealth v. Hoppert*, 39 A.3d 358, 361–62 (Pa. Super. 2012)).

Some factual background is necessary to understand the nature of the evidence sought to be suppressed, as well as the manner in which it was obtained. Co-defendant Cole's driver's license and debit card were found at the scene of a burglary of Cindy Skylight Liquors in Elkridge, Maryland, on August 12, 2013. N.T. Suppression Hearing, 8/26/14, at 16-18. Officers responding to the burglary collected these items from the scene of the burglary, processed them into evidence, where they were reviewed by Officer Nathan Guilfoyle, who initially led the investigation. Officer Guilfoyle took this evidence to the Repeat Offender Proactive Enforcement (ROPE) Division of the Criminal Investigations Bureau of the Howard County Police Department.

Detective Kreller was a supervising member of the ROPE team, and the ROPE team's primary purpose was to assist other criminal investigation divisions by providing covert surveillance of individuals suspected of committing crimes in or around Howard County. *Id.* at 55. Essentially, Detective Kreller was assigned to follow Cole and his suspected cohorts and report on any suspicious or criminal activity observed.

Initially, Detective Kreller obtained historical cell phone tracking data which indicated the presence of the suspects' cell phones near the Cindy Skylight Liquors at the time that business was burglarized.[1] *Id.* at 62-64. Detective Kreller stated that Cole and his cohorts were already on the ROPE team's radar due to prior investigations, and that the police had been aware of their "unique MO." *Id.* at 93. Cole and his co-defendants were previously suspected in multiple prior burglaries. *Id.* Detective Kreller began to focus on Cole because of the ID evidence obtained at the Cindy Skylight Liquors burglary. *Id.* at 95. On one occasion prior to his foray into Pennsylvania while tracking Appellant, Detective Kreller observed him, in his white van, meet up with co-defendant Smith, in his Yukon. *Id.* at 96. Officer Kreller followed them to a gas station in Woodbine, Maryland, where a burglary of a gas station occurred that same evening. *Id.* Detective Kreller also observed Appellant and another individual ostensibly casing a gas station in Bartonsville, Maryland. *Id.* Appellant and his cohort were seen "on the roof" of the business at 2:30 a.m., inexplicably but for nefarious motives, although it appears as if they did not attempt to gain entry at that time. *Id.*

On August 26, 2013, the evening of the Blue Ridge Country Club burglary, Detective Kreller was in Howard County when he was alerted that the suspects were moving north on Interstate 83 in Maryland. Detective

---

[1] The Commonwealth sought to admit this historical cell phone tracking data under Pa.R.E. 404(b).

Kreller followed them all the way to Harrisburg, Pennsylvania. *Id.* at 98. Eventually, he tracked them to the Blue Ridge Country Club, where he first observed Cole and Appellant circling the surrounding area in Appellant's vehicle. *Id.* at 97-99. Subsequently, Detective Kreller observed the following:

> So we heard an audible alarm from the Blue Ridge and we knew they were in that area. And at this point it's really tough on us trying to get in as close as we can without being compromised. So basically myself and another detective were laying in a fairway of the golf course where we watched suspects walk across the fairway to the direction of what I would refer to as the clubhouse, or the pro shop where they were there for an extended period of time.
>
> And then we observed two suspects walk back across the fairway. I don't know of the time, five, ten minutes. I would have to review my report how long it was, where they were at the direction of the pro shop. But once they walked back across the fairway there was then four suspects that came into our view as they walked along Route 39 dressed in all black clothing, ski masks, and items in their hand.
>
> As cars came on along Route 39 the suspects would go to the guardrail. They would go to the wood side of the guardrail. They would hunch down where it looks thick. They were trying to hide themselves from traffic. And they would then walk back and continue along Route 39.

*Id.* at 100. Detective Kreller did not enter Pennsylvania in response to a request from any Pennsylvania police department. However, neither Detective Kreller nor his ROPE team members attempted to effectuate an arrest of any of the individuals they observed at that time. *Id.* at 103.

Appellant sought to suppress these observations, as well as the cell phone tracking evidence that led Detective Kreller to follow the defendants

to the Blue Ridge Country Club, based on the claim that Detective Kreller and his fellow Maryland officers made these observations without any authority under, or in contravention to, Pennsylvania law.

Appellant first asserts that the Maryland officers were conducting a search within the meaning of the Fourth Amendment of the U.S. Constitution, and Article I, Section 8, of the Pennsylvania Constitution, thus requiring a warrant or a showing of probable cause and exigency in the absence of a warrant, when they tracked Appellant's and his cohort's cell phones using real-time, GPS data provided by their phone carriers. We agree with this aspect of Appellant's argument. *See Commonwealth v. Rushing*, 71 A.3d 939, 961-64 (Pa. Super. 2013) (holding the "[a]ppellant did have a legitimate expectation of privacy that the government could not surreptitiously track his real time location via his cell phone signal" and that the "police were required to make a showing of probable cause in order to obtain real time cell site information data," and to demonstrate "exigent circumstances" in the absence of a warrant), *rev'd on other grounds*, 99 A.3d 416 (Pa. 2014).

However, Appellant's argument then immediately proceeds to consider whether "the exclusionary rule applies," after summarily concluding that "[i]nasmuch as their activities are not embraced by the statutory exceptions set forth in 42 Pa.C.S. §§ 8921-8924 and 42 Pa.C.S. §§ 8951-8954...." Appellant's Brief at 44. Appellant overlooks, or simply fails to develop, any argument that these searches were, in fact, unconstitutional or otherwise

- 16 -

illegal under Pennsylvania law. Although it is apparent that Appellant believes the MPJA and hot pursuit statute were violated, there is virtually no explanation beyond a bald assertion as to why that was the case. Moreover, we find Appellant's argument to be unresponsive to the trial court's analysis in its opinion. Regarding Appellant's claim(s), the trial court stated:

> [Appellant], in essence, is contending that the observations, cellular phone records and "pings" obtained by Maryland law enforcement officers should be suppressed. The Maryland law enforcement officers merely observed what occurred at the Blue Ridge Country Club. After observing the burglary at Blue Ridge, Detective Guilfoyle reached out to Detective Glucksman. Additionally, for the Thorndale Exxon incident, [Detective] Kreller testified that he followed the suspects up to the Mason-Dixon Line (but stayed in Maryland). We are unable to ascertain how the Maryland Officers "illegally" entered the Commonwealth of Pennsylvania thus causing their visual observations to be suppressed. The ROPE team was operating and investigating suspects that were believed to be in their own jurisdiction. After tracking the suspects to Pennsylvania, they observed them at the golf course and did not attempt to make an arrest. Instead, they followed the proper channels and made contact with detectives from Pennsylvania. We further note that Detective Glucksman and the Maryland Officers entered a joint operation in an attempt to stop this string of burglaries. The Howard County Police officers were doing their job in an attempt to stop a string of burglaries that had been occurring in their jurisdiction. [Appellant] was ultimately arrested by Pennsylvania State Troopers and Detective Glucksman was the affiant in this case. Accordingly, it is clear that this Court did not err in denying the [Appellant]'s pretrial motion to suppress any and all evidence observed by the Howard County Police Officers.

TCO at 12.

First, we agree with the trial court's implying that the Maryland officers' observations at Blue Ridge Country Club did not constitute a

constitutionally regulated search or seizure. Among other things, Appellant had no legitimate expectation of privacy with regard to observations of his conduct while he trespassed on a golf course in the middle of the night. **See generally Commonwealth v. Russo**, 934 A.2d 1199, 1213 (Pa. 2007) (holding "that the guarantees of Article I, Section 8 of the Pennsylvania Constitution do not extend to open fields; federal and state law, in this area, are coextensive"). Appellant provides no argument to the contrary.

Second, with regard to the live-tracking of Appellant's cell phone into Pennsylvania, and the obtaining of his historical cell phone records (which included data showing Appellant's presence and movement in Pennsylvania), Appellant does not dispute that these 'searches' were the subject of lawfully obtained court orders in Maryland. Thus, while the circumstances of this case might present the novel issue of whether continuous searches of this nature, although authorized by lawful court orders in Maryland, nevertheless cease being lawful when they cross an interstate border, Appellant provides no discussion, whatsoever, as to why that is the case, other than to baldly invoke the MPJA and hot pursuit statutes.[2] In his brief, Appellant sidesteps

---

[2] Indeed, that such searches are illegal, or become illegal once they cross state lines, is far from obvious. We note that the MPJA provides that a police officer has the power to act outside of his primary territorial jurisdiction when "the officer is acting pursuant to an order issued by a court of record or an order issued by a district magistrate whose magisterial district is located within the judicial district wherein the officer's primary jurisdiction is situated … except that the service of an arrest or search warrant shall require the consent of the chief law enforcement officer, or a
*(Footnote Continued Next Page)*

this issue entirely and merely presumes the searches' illegality, and then argues, extensively, as to why the exclusionary rule should apply. This is putting the proverbial cart before the horse. Consequently, we are constrained to conclude that Appellant has waived his suppression claim in its entirety due to his failure to adequately develop an argument on appeal. *See Commonwealth v. Walter*, 966 A.2d 560, 566 (Pa. 2009) (holding claims waived for failure to develop them).

Next, Appellant claims that the trial court erred by denying his challenge to exclude evidence pursuant to *Frye*; specifically, Appellant sought to exclude testimony which interpreted the historical cell phone records in order to determine Appellant's and his co-defendants' locations at the time of the robberies.[3] "Under *Frye*, novel scientific evidence is admissible if the methodology that underlies the evidence has general acceptance in the relevant scientific community." *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1043–44 (Pa. 2003).

---

*(Footnote Continued)* ———————————

person authorized by him to give consent, of the organized law enforcement agency which regularly provides primary police services in the municipality wherein the warrant is to be served." 42 Pa.C.S. § 8953(a)(1). Appellant does not explain why this provision did not apply to the Maryland officers, considering they obtained court orders for the live-tracking of Appellant's cell phone, and for his historical cell phone records, in their primary jurisdiction, and no arrest or search warrants were "served" outside of that jurisdiction.

[3] Appellant does not challenge any evidence concerning the real-time tracking of his cell phone under *Frye*.

As a general rule, this Court's standard of review of a trial court's evidentiary ruling, including a ruling whether expert scientific evidence is admissible against a *Frye* challenge, is limited to determining whether the trial court abused its discretion. *Grady*[], … 839 A.2d [at] 1046[]; *Zieber v. Bogert*, 565 Pa. 376, 773 A.2d 758, 760 n. 3 (2001) (citing *Commonwealth v. Minerd*, 562 Pa. 46, 753 A.2d 225 (2000)). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Grady*, 839 A.2d at 1046 (citing *Paden v. Baker Concrete Constr., Inc.*, 540 Pa. 409, 658 A.2d 341, 343 (1995)).

*Commonwealth v. Dengler*, 890 A.2d 372, 379 (Pa. 2005).

The admissibility of expert scientific testimony is governed by Pa.R.E.

702, which reads:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;

(b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

Our Supreme Court has explained:

This Court has noted that the *Frye* test, which was adopted in Pennsylvania in *Commonwealth v. Topa*, 471 Pa. 223, 369 A.2d 1277 (1977), "is part of Rule 702." *Grady*, 839 A.2d at 1042. In *Frye*, the Court of Appeals of the District of Columbia considered whether expert evidence concerning a blood pressure "deception test," which supposedly determined whether a test

subject was being truthful based on changes in blood pressure, was admissible against a criminal defendant. In rejecting the evidence, the court opined that, to be admissible, the evidence must be sufficiently established and accepted in the relevant scientific community:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Frye*, 293 F. at 1014. This passage sets forth the core of what has come to be known as the "*Frye* test."

In *Topa*, where this Court considered spectrographic voice print identification evidence, we described the *Frye* standard as follows: "Admissibility of the [scientific] evidence depends upon the general acceptance of its validity by those scientists active in the field to which the evidence belongs." *Id.* at 1281. In finding that the proffered scientific evidence was inadmissible in *Topa*, the Court quoted the rationale set forth by the Court of Appeals of the District of Columbia in *United States v. Addison*, 498 F.2d 741, 744 (D.C. Cir. 1974):

> "The requirement of general acceptance in the scientific community assures that those most qualified to assess the general validity of a scientific method will have the determinative voice. Additionally, the *Frye* test protects prosecution and defense alike by assuring that a minimal reserve of experts exists who can critically examine the validity of a scientific determination in a particular case. Since scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury of laymen, the ability to produce rebuttal experts, equally conversant with the mechanics and methods of a particular technique, may prove to be essential."

*Topa*, 369 A.2d at 1282.

This Court has consistently followed this manner of approach when confronted with novel scientific evidence in the three decades since our adoption of *Frye*. *See Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981) (process of refreshing recollection by hypnosis not yet accepted); *Commonwealth v. Dunkle*, 529 Pa. 168, 602 A.2d 830 (1992) ("Sexually Abused Child Syndrome" evidence not admissible); *Commonwealth v. Zook*, 532 Pa. 79, 615 A.2d 1 (1992) (electrophoresis test of dried blood stains deemed admissible); *Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395 (1994) (certain DNA evidence deemed inadmissible); *Dalrymple v. Brown*, 549 Pa. 217, 701 A.2d 164 (1997) (repressed memory theory deemed inadmissible); *Commonwealth v. Crawford*, 553 Pa. 195, 718 A.2d 768 (1998) (revived repressed memory testimony rejected); *Blum ex rel. Blum v. Merrell Dow Pharmaceuticals, Inc.*, 564 Pa. 3, 764 A.2d 1 (2000) (expert testimony regarding causal link between mother's ingestion of drug and child's birth defect deemed too unreliable to be admitted where it involved recalculation of data used in other studies); *Grady*, *supra* (expert witness's conclusion concerning safety of food product inadmissible because expert's methodology lacked general acceptance in relevant scientific community for purposes of reaching such conclusion). In addition, in *Grady*, this Court recently made clear that *Frye* would remain the governing Pennsylvania standard, and not the newer federal standard represented by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Grady*, 839 A.2d at 1044-45.

*Dengler*, 890 A.2d at 380–81.

Instantly, Appellant argues that the trial court erred by admitting evidence concerning his location, or the location of his co-defendants, which was derived from the historical data obtained from their cell phones. Appellant explains:

Historical cell tower records, also known as call detail records, are the billing records that the cell companies use to keep track of their customers' calls. They show the date and time of all calls made or received, the numbers called, the duration of each call, and the cell towers used to begin and end a call.

By comparison, it is a more established procedure for a cell company - after being served with a court order or search warrant - to perform a real-time, live "ping" of a cell phone equipped with GPS technology. GPS "pinging" in many cases can assign a caller's location down to a radius of 20 meters.

At trial, the Commonwealth produced expert testimony that, *inter alia*[,] had these components: (a) [Appellant]'s cell phone utilized a particular 120 degree "sector" of a particular cell phone tower at a time relevant to the prosecution; and (b) the cell phone was located at that time in a quantifiable distance - the so-called "footprint" - from the relevant sector of that particular cell tower. The first conclusion is based on the premise that a cell phone will always connect to the tower with the strongest signal, usually the one closest to the phone when the call is made. The so-called "footprint" in the context of the second conclusion is actually a quantification of the radio range of the particular cell tower.

At the pretrial **Frye** hearing on August 24, 2014, the Commonwealth presented no expert testimony. The employee of Sprint was admittedly not an expert. Neither was Detective Glucksman. He merely stated that he was trained to plot the historical cell tower information on a map pursuant to instructions that he received at certain courses. Accordingly, the Commonwealth produced no expert testimony at the pretrial hearing detailing the scientific basis behind the two components of cell tower analysis.

In point of fact, the Commonwealth at the time of the pretrial hearing did not even believe that it was necessary to present an expert witness at trial. That belief changed by the time of trial, and the Commonwealth produced expert testimony from FBI Special Agent Richard Fennern. However, even if one bootstraps Richard Fennern's trial testimony onto the evidence adduced at the pretrial **Frye** hearing, there is still no expert testimony explaining the scientific basis of historical cell tower analysis, especially the method by which the FBI is able to calculate a quantifiable "footprint" of the cell tower at the relevant time.

Appellant's Brief at 49-51 (citations to record omitted).

The trial court determined that the contested testimony was not "novel" under the **Frye** test.  TCO at 14.  The court's conclusion was based on Special Agent Fennern's testimony that

> with his ample education and experience, [he] credibly confirmed that historical cellular data analysis is not novel science.  There was nothing presented in the testimony to dispute that the functioning of the cell phone in relation to the cell tower and the resulting data recorded is [not] novel in the cellular service provider community or the electronics community generally.

TCO at 14-15.

Thus, the Commonwealth put forward evidence through Special Agent Fennern that the science at issue is not novel.  In his brief, Appellant fails to point to any evidence or testimony that contradicts this conclusion. Indeed, our review of the record indicates that Appellant did not offer testimony by any expert, in any field, to contradict the Commonwealth's evidence that the science at issue is not novel.  It is not apparent, therefore, under our abuse-of-discretion standard of review, that the court's decision in this regard was contrary to any evidence or testimony of record.  In fact, it was consistent with the only evidence of record presented on the topic.

Nevertheless, Appellant's argument suggests that the court's decision was contrary to existing law, or should be determined to be, despite the evidentiary record in this case.  In this regard, Appellant relies on a federal district court case, **U.S. v. Evans**, 892 F.Supp.2d 949, 951 (N.D. Ill. 2012), in which similar evidence was rejected by the federal district court.  Initially, the Commonwealth objects to this authority on the basis that it is not

precedential, and applied the **Daubert** standard, not the **Frye** standard as is applicable in this Commonwealth. While we recognize that **Evans** is not precedential, we may look to it as persuasive authority. **See Martin v. Hale Products, Inc.**, 699 A.2d 1283, 1287 (Pa. Super. 1997) ("Decisions of the federal courts lower than the United States Supreme Court possess a persuasive authority."). And while we agree with the Commonwealth that the applicable standard differs, this Court is not categorically barred from considering the reasoning behind that decision in coming to our own conclusion.

> In **Evans**, a kidnapping case, the prosecution proposed to call
>
> Special Agent Raschke to testify about the operation of cellular networks and how to use historical cell site data to determine the general location of a cell phone at the time of a particular call. Applying a theory called "granulization," Special Agent Raschke proposes to testify that calls placed from Evans's cell phone during the course of the conspiracy could have come from the building where the victim was held for ransom.

**Evans**, 892 F.Supp.2d at 951.

Evans challenged Agent Raschke's testimony under the F.R.E. 702, *i.e.*, the **Daubert** test. The court first determined that Agent Raschke was qualified "to testify as an expert concerning the operation of cellular networks and granulization theory." **Id.** at 955. The court also determined that Agent Raschke's testimony regarding how the cellular networks operate, without applying that knowledge to the facts of the case, was admissible. **Id.** However, the court ultimately determined that Agent Raschke could not testify regarding the application of the granulization theory to the facts of

the case, that is, he could not testify regarding a prediction as to a specific location for the Evans' cellphone, "[g]iven that multiple factors can affect the signal strength of a tower and that Special Agent Raschke's chosen methodology has received no scrutiny outside the law enforcement community, the court concludes that the government has not demonstrated that testimony related to the granulization theory is *reliable*." ***Id.*** at 957 (emphasis added). This was despite Agent Raschke's testimony that "he has used this theory numerous times in the field to locate individuals in other cases with a zero percent rate of error. He also testified that other agents have successfully used this same method without error." ***Id.*** at 956.

In our view, the federal court's decision in ***Evans*** is distinguishable from the instant matter on both the facts and the law. First, as a factual matter, the ***Evans*** case involved pinpointing Evans' cell phone at a particular location at a particular time. As noted by Appellant here, and the ***Evans*** court, this can be problematic because the presumption that a cell phone connects to the closest cell phone tower may sometimes be incorrect. Obstructions could cause a phone to connect to a different tower, or a particular call could be rerouted due to network traffic. Thus, pinpointing a cell phone's location at one moment in time is potentially unreliable.

However, the nature of the evidence in this case was not nearly as unreliable. Agent Fennern did not testify as to precise locations for the defendants' phones. Agent Fennern demonstrated that the defendants' cell phones showed activity in Maryland before the burglaries, activity *in the*

- 26 -

*vicinity* of the burglaries in various locations in Pennsylvania at the same time as the burglaries, and then more activity back in Maryland following the burglaries. N.T., 1/29/16, at 1030-63. Most importantly, this information was consistent *for each of the defendants' phones*. At no point did Agent Fennern testify that any of the defendants were at the scene of a particular burglary at a particular time. Nevertheless, in aggregate, this was powerful circumstantial evidence of the defendants' involvement and coordination in the burglaries. Although it may not have been 100% clear which specific tower a specific cell phone was communicating with at a specific time, the defendants' cell phones were not communicating with a tower in central Pennsylvania when the data indicated apparent activity in the Baltimore area, and vice versa, given the inherent limitations of the range limits of the cell phones and cell phone towers. Accordingly, we find the concerns of the **Evans** court were relatively minimal in the instant case.

Second, it appears as if the basis for the **Evans** court's decision was, at least in part, based on a **Daubert** factor that is not required under the **Frye** standard. Under **Frye**, the test is whether "*novel* scientific evidence is admissible if the methodology that underlies the evidence has general acceptance in the relevant scientific community." **Grady**, 839 A.2d at 1043-44 (emphasis added). Under **Daubert**, "the trial judge evaluates whether the evidence will assist the trier of fact, and whether the evidence is reliable and scientifically valid." **Id.** at 1044. Thus, under the federal **Daubert** standard, reliability is determined by the court. Under **Frye**, reliability is

evaluated by the jury. In *Evans*, the court determined that the assumptions about which towers were used, assumptions necessary to pinpoint a cell phone's location, were unreliable in light of the specific purpose for which the scientific theory in question was being used. Not only are such concerns not nearly as impactful on the evidence in the instance case, but it was for the jury to determine the reliability of the expert's opinion. Moreover, the *Evans* court's decision on this matter does not represent any sort of consensus in the federal courts. At least two other federal district courts have reached the opposite conclusion regarding identical objections to the same technology concerning general acceptance and reliability. *See U.S. v. Banks*, 93 F.Supp.3d 1237, 1252 (D. Kan. 2015) ("The [c]ourt finds *Benford*'s analysis persuasive and reaches the same conclusion as it did."); *U.S. v. Benford*, 2010 WL 2346305, at *3 (N.D. Ind. 2010) (holding witness qualified to provide expert opinion about the defendant's approximate location based on cell-site data) (unreported).

Finally, here, the trial court determined that the science involved was "not novel science[,]" based on its determination that Agent Fennern testified credibly to that effect. TCO at 14-15. While the *Evans* court reached a different determination, its factual conclusions were not binding on the trial court in this case, and given the opposite conclusions reached in *Benford* and *Banks*, we ascertain no abuse of discretion on that basis. Accordingly, we conclude that Appellant's third claim lacks merit.

Next, Appellant asserts that the trial court abused its discretion when it admitted prior-bad-acts evidence concerning the three defendants, regarding

> (1) the August 13, 2013, burglary of Cindy's Skylight in Howard County, Maryland; (2) a search of a vehicle in Montgomery County, Pennsylvania, on May 10, 2010, said vehicle being occupied by [Appellant]; and (3) a search of a vehicle in Walkersville, Maryland, in July 2009, said vehicle being occupied by [Appellant] and Cornell Smith.

Appellant's Brief at 54. Specifically, Appellant argues that, contrary to the ruling of the trial court, this evidence did not constitute "identity" or "*res gestae*" evidence within the meaning of Pa.R.E. 404(b)(2).

> The admission of evidence is solely within the province of the trial court, and a decision thereto will not be disturbed absent a showing of an abuse of discretion. "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias[,] or ill-will discretion ... is abused."

***Commonwealth v. Murray***, 83 A.3d 137, 155-56 (Pa. 2013) (internal citations omitted).

> Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. Pa.R.E. 404(b)(2). In determining whether evidence of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact. ***Commonwealth v. Powell***, 598 Pa. 224, 956 A.2d 406, 419 (2008).

*Commonwealth v. Sherwood*, 982 A.2d 483, 497 (Pa. 2009). Another exception to the prior-bad-acts-evidence ban set forth in Rule 404(b)(1) has been recognized by our courts, although not explicitly mentioned in Rule 404(b)(2),[4] is one "that permits the admission of evidence where it became part of the history of the case and formed part of the natural development of facts. This exception is commonly referred to as the *res gestae* exception." *Commonwealth v. Ivy*, 146 A.3d 241, 251 (Pa. Super. 2016) (citation omitted).

With regard to the identity exception set forth in Rule 404(b)(2), this Court has previously stated:

> Identity as to the charged crime may be proven with evidence of another crime where the separate crimes share a method so distinctive and circumstances so nearly identical as to constitute the virtual signature of the defendant. Required, therefore, is such a high correlation in the details of the crimes that proof that a person committed one of them makes it very unlikely that anyone else committed the others.

*Commonwealth v. Weakley*, 972 A.2d 1182, 1189 (Pa. Super. 2009) (citations and quotation marks omitted). However, "[a] review of Rule 404(b)(1) and relevant jurisprudence shows the other crime need not match every fact and circumstance of the charged crime before it may be used to prove identity." *Id.* at 1190.

---

[4] As the comment to Rule 404 notes, "Pa.R.E. 404(b)(2) … contains a *non-exhaustive list of purposes*, other than proving character, for which a person's other crimes wrongs or acts may be admissible." Pa.R.E. 404 (comment) (emphasis added).

The trial court determined that the instant case was substantially similar to what had occurred in **Weakley**. TCO at 21. In **Weakley**, a robbery/murder case involving victims Kerkowski and Fassett, the Commonwealth sought to introduce evidence against Weakly and his co-conspirator regarding a subsequent robbery of Samuel Goosay, due to the following similarities between the two cases:

> (1) Both crimes were allegedly committed by Selenski and co-defendant Weakley; (2) Flex ties found on the bodies of the homicide victims were visually, instrumentally, and steromicroscopically similar to those removed from Samuel Goosay, the victim of the subsequent robbery; (3) Flex ties were used to bind the hands of Kerkowski and Fassett in the homicides, and used to bind the hands of Goosay in the robbery. (4) Duct tape found on the body of the homicide victim Kerkowski was visually, instrumentally and stereomicroscopically similar to the tape removed from Goosay, the robbery victim; (5) Duct tape was used to cover the eyes of Kerkowski and Goosay; (6) Flex ties were used in conjunction with duct tape as a distinct method of restraint of the victims in the two incidents; (7) The two crimes or incidents occurred in or involved the victims' residences, as opposed to their businesses; (8) Kerkowski and Goosay were both small business owners; (9) Goosay's jewelry store and Kerkowski's pharmacy both dealt in large sums of cash; (10) Jewelry and prescription drugs have independent street value; (11) The victims of the two matters were left bound as the assailants fled; (12) Flex ties and duct tape were found or seen at both defendant's properties and/or in their vehicles.

**Weakley**, 972 A.2d at 1192.

The trial court granted the defendants' motions *in limine* to exclude this evidence pursuant to Rule 404(b)(1). This Court reversed, holding that:

> While this list requires pruning of conclusory and repetitive entries, what remains nevertheless describes a crime so distinctive in method and so similar to the charged crime that

proof appellees committed one tends to prove they committed the other. The evidence thus goes beyond showing mere conformity with a propensity to commit a class of crime, to wit, violent robbery—a purpose prohibited under Pa.R.E. 404(b)(2). Instead, the evidence shows identity—a purpose permitted under Pa.R.E. 404(b)(3)—through selection of a particular class of victim and use of idiosyncratic methods to carry out the crimes. The probative value of this strong identity evidence, moreover, outweighs its presumed potential for prejudice.

*Weakley*, 972 A.2d at 1188.

Instantly, in his brief, Appellant provides no response to the trial court's reliance on *Weakley*. Instead, he relies on boilerplate statements of the law concerning the identity exception, from which he conducts his own analysis. Although Appellant's analysis is not trivial, we are constrained by our reading of *Weakley* to conclude that that the trial court did not abuse its discretion by permitting the at-issue prior bad acts to be admitted under the identity exception. Although the identity-based justification for the admission of this evidence appears somewhat or marginally less "unique" than the evidence involved in *Weakley*, this matter is not so distinguishable from that case such that it would compel us to conclude that the trial court's decision was an abuse of discretion. To be clear, we hold that while the trial may very well have committed "an error in judgment" in admitting this evidence under the identity exception to Rule 404(b)(1), that error was neither "manifestly unreasonable," nor a clear misapplication of the law. *Murray*, 83 A.3d at 156. Rather, we deem the trial court's decision to be within a range wherein reasonable minds can disagree whether the evidence was sufficiently unique to constitute "identity" evidence. *See Grady*, 39

A.2d at 1046 ("An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion….").

Nevertheless, even if is was a clearly erroneous or manifestly unreasonable determination that the three contested incidents were admissible under the identity exception, we would nevertheless decide, *sua sponte*, that admission of that evidence constituted harmless error in this case, for a multiplicity of reasons. "The standard for determining harmless error was firmly established in **Commonwealth v. Story**, 476 Pa. 391, 383 A.2d 155 (1978). An error will be deemed harmless where the appellate court concludes beyond a reasonable doubt that the error could not have contributed to the verdict. If there is a reasonable possibility that the error may have contributed to the verdict, it is not harmless." **Commonwealth v. Mitchell**, 839 A.2d 202, 214 (Pa. 2003).

First, with regard to all the co-conspirators, this evidence might have been admissible to show opportunity and/or absence of mistake, especially the two incidents involving traffic stops where burglary tools were discovered. Here, a large volume of historical cell phone evidence demonstrated that Appellant and his cohorts were repeatedly and consistently in the vicinity of each of the burglaries for which they were tried, but no evidence could put them precisely inside the businesses which had been burglarized. Thus, it could be argued, albeit somewhat unreasonably, that the historical cell phone evidence was merely coincidental. However, when the same co-conspirators had been previously

found traveling together with burglary tools, such evidence tends to strongly show that the historical cell phone evidence did not falsely implicate them by mere "accident." Their collective possession of burglary tools at earlier times, whether or not they were arrested during those traffic stops, also demonstrated, to some extent, the "opportunity" to commit the subsequent burglaries. Thus, while it may have been difficult to specifically characterize this prior-bad-acts evidence as precisely falling into one category set forth in Pa.R.E. 404(b)(2), it did tend to loosely fit the purpose of many of the enumerated categories of prior-bad-acts exceptions. In this regard, we reiterate that the list of enumerated exceptions set forth in Pa.R.E. 404(b)(2) is non-exhaustive. **See** footnote 4, **supra**.

Second, the evidence in this case was, in fact, overwhelming, albeit circumstantial, and the potential prejudice deriving from the disputed evidence was minimal in comparison. Simply put, in aggregate, the historical cell phone data placing each co-defendant in the vicinity of each robbery at the time of those robberies was overwhelming evidence of guilt, especially in light of the fact that Appellant and his co-defendants were caught fleeing the final burglary (Shell at Top of the 80s Gas Station) in Appellant's vehicle, which was found to contain burglary tools required for the manner in which the burglary occurred, as well as some of the items reported stolen from that location.

Third, with regard to Appellant's specific objections that he was not directly involved in two of the prior incidents, Appellant is correct that such a

fact makes that evidence less probative with respect to his own guilt. However, *for the very same reason*, that fact also tends to make the evidence far less prejudicial to him within the context of Rule 404(b). Prior bad acts are inadmissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(2). Evidence of Appellant's co-conspirators' prior bad acts does not tend to prove or risk adverse jury inferences regarding *Appellant's character*, because he was not involved in those incidents. Appellant does not dispute that the jury was accurately instructed with regard to the participants of each of those prior events. It appears to this Court to be quite unlikely that the jury would draw an adverse, illogical inference regarding Appellant's character from the prior conduct of others.

Accordingly, we hold that the trial court did not abuse its discretion in admitting the prior-bad-acts evidence in question under the identity exception because, although we might have arrived at a different conclusion, the trial court's decision was neither manifestly unreasonable nor a clear misapplication of the law. In any event, we would conclude that the admission of this evidence constituted harmless error, beyond a reasonable doubt, even if it was erroneously admitted.

Finally, Appellant asserts that the trial court abused its discretion by overruling two separate motions for a mistrial, 1) when the prosecutor, during his opening statement, referred to prior unlawful activity by Appellant and his co-conspirators in Maryland; and 2) when a Commonwealth witness,

Detective Kreller, alluded to prior unlawful activity by Appellant and his co-conspirators in Maryland. Appellant asserts that, on both occasions, the Commonwealth exceeded the bounds set by the trial court in its pretrial rulings on the motions *in limine* filed by the parties.

"The grant of a mistrial is within the sound discretion of the trial judge. A mistrial is required only when an incident is of such a nature that its unavoidable effect is to deprive appellant of a fair trial." **Commonwealth v. Crawley**, 526 A.2d 334, 342 (Pa. 1987) (internal citations and quotation marks omitted). Even assuming these two events exceed the bounds of the pretrial orders,[5] the Commonwealth argues that any such error was

---

[5] Appellant does not direct this Court's attention to where in the record such pretrial rulings or restrictions can be found. While it is apparent that the trial court granted the Commonwealth's motion *in limine*, thereby permitting evidence regarding the prior-bad-acts evidence discussed above, this Court could not locate the order in question in the certified record. However, the basic nature of that order in not in dispute. By inference, therefore, the Commonwealth was not permitted to admit evidence of other prior bad acts. Moreover, immediately prior to trial, Appellant and his co-defendants raised an oral motion *in limine* regarding the ROPE team's acronym moniker, which means "Repeat Offender Proactive Enforcement." The defendants objected "because of the prejudice it would call into the jury's mind regarding our clients and their prior criminal histories." N.T., 1/22/16, at 7. In response, the prosecutor stated that, "[a]bsent any door opening on the defense's side, the only plans for introducing prior bad acts or prior history would be the information that we've already moved for 404(b) admission, those things that were included in the ROPE [team's] dossier and those would be the things that we would be seeking to enter into evidence at trial." *Id.* at 9. The trial court responded, "[v]ery well," indicating that it was granting the oral motion *in limine*. Thus, any other prior-bad-acts evidence other than the three events discussed above were effectively precluded as a result of the court's granting of these two motions *in limine*.

harmless, in both instances, and did not amount to prejudice "of such a nature that its unavoidable effect is to deprive appellant of a fair trial." *Crawley*, 526 A.2d at 342. For the reasons that follow, we agree with the Commonwealth.

The first ostensible breach of the motions *in limine* occurred during the Commonwealth's opening statement to the jury. At that time, the prosecutor described the ROPE team as follows:

> It's a proactive enforcement team funded by the county down there who keeps dossiers of people who may have prior circumstances that might mirror these situations.
>
> And what you'll hear from them is that they had dossiers on at least two of these individuals having substantially similar tools to the type that would have committed these types of burglaries in 2009 and 2010.
>
> [The prosecutor then describes two of the prior-bad-act events that were deemed admissible by the trial court.]
>
> As you'll hear, the ROPE team, the other job that they do on top of keeping dossiers is to surveil. They are a proactive team. They're not somebody who looks at crimes that have happened like most law enforcement. No, they're active.

N.T., 1/22/16, at 49-50.

Appellant and his co-defendants objected and requested a mistrial following the prosecutor's opening statement, on the basis that the prosecutor had made multiple references to "dossiers" on the defendants. The prosecutor argued that the term "dossiers" was only referring to the two prior-bad-act events which had been deemed admissible by the trial court, explaining, "I didn't make any reference to any prior burglaries that would

have been conducted or criminal history…." *Id.* at 57. The defendants countered that "calling them dossiers that they have on the individuals, that is highly inflammatory and would lead the jury to believe that they have records and other backgrounds beyond the limited items that this Honorable Court allowed to come in under 404(b)." *Id.* The trial court denied the defendants' motion for mistrial. *Id.* at 58.

While the prosecutor's reference to "dossiers" was somewhat ambiguous, he did not explicitly refer to any prior bad acts beyond those deemed admissible. Appellant would have this Court conclude that such ambiguity necessarily infected the jury with the worst possible inference, that the "dossiers" in question involved evidence of criminal activity beyond what was *directly* suggested in his remarks. However, we are under no obligation to assume that was the case. As the United States Supreme Court has stated with regard to an ambiguous statement during a prosecutor's closing remarks:

> The 'consistent and repeated misrepresentation' of a dramatic exhibit in evidence may profoundly impress a jury and may have a significant impact on the jury's deliberations. Isolated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions. Such arguments, like all closing arguments of counsel, are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will

draw that meaning from the plethora of less damaging interpretations.

***Donnelly v. DeChristoforo***, 416 U.S. 637, 646–47 (1974).

Here, while it may have constituted misconduct for the prosecutor to carelessly use the term "dossiers," it is clear in this context that he intended to refer to the already-deemed admissible, prior-bad-acts evidence, and no more. That clarity arises not just from the prosecutor's subsequent defense of his statement, but also flows from the statement itself. Most importantly, we do not view that statement as inflammatory to such an extent that Appellant was deprived of a fair trial because of it. Therefore, we conclude that the trial court did not abuse its discretion when it declined to grant a mistrial on that basis.

The second ostensible breach of the motions *in limine* occurred during the testimony of Detective Kreller. In his brief, Appellant states that Detective Kreller "revealed that his unit was investigating the defendants for activities in addition to the instances that were the subject of the [c]ourt's pretrial ruling." Appellant's Brief at 64. Appellant also provides a page number for the apparent offense. ***Id.*** (citing N.T., 1/28/16, at 941-42). However, nowhere in Appellant's brief does he explain how Kreller's testimony breached the pretrial rulings, nor is such a breach immediately apparent to this Court from our reading of the cited pages, as no objection

was lodged immediately.[6] Presumably, Appellant takes issue with Detective Kreller's statement that there was "probable cause that dates back a long time prior to this actual case … from prior cases dating back to 2009 [and] 2010." N.T., 1/28/16, at 941. Detective Kreller then identifies those "cases" as being from Walkersville, Maryland, in 2010, and Frederick County, in 2009. *Id.* at 942. Those dates correspond with the admissible prior-bad-acts evidence, but not with the locations of those events. The trial court denied Appellant's motion for a mistrial, but stated:

> I'll deny the motion for now. However, 404(b) has gone far beyond what I thought it was going to be.
>
> I just want -- the only testimony I want to hear is these guys following this crew from Maryland up here and that's it. Nothing else.

*Id.* at 957.

This breach appears somewhat more egregious than the prosecutor's statement during his opening argument. While the term "dossiers'" was patently ambiguous with respect to whether it implied prior criminal conduct, Detective Kreller's use of the term, "probable cause" in this instance, was far less so. The use of that term certainly indicated that some sort of prior criminal investigation was being referenced, as "probable cause" is not a term typically used outside of the criminal context.

---

[6] Several questions later, Appellant's trial counsel objected, but the basis for the objection does not appear on the record. *Id.* at 943. Indeed, the request for a mistrial did not occur until direct examination of Detective Kreller ended. *Id.* at 956.

However, we observe that no details of any sort regarding those investigations, beyond a general date and general location, were mentioned by Detective Kreller.  There was no mention of who, specifically, was the target of the prior investigation(s), what specific or general type of crime(s) had been involved, what facts led to a finding of probable cause, nor whether those investigations bore any fruit in terms of an arrest or conviction.  Thus, we agree with Appellant that Detective Kreller's testimony was clearly outside the scope permitted by the trial court's pretrial orders.

Nevertheless, "[t]here is no *per se* rule requiring a new trial every time there is a reference to prior criminal activity." ***Commonwealth v. Sanchez***, 595 A.2d 617, 620 (Pa. Super. 1991).  For instance, in ***Sanchez***, the prosecutor made repeated references to the defendant's status as an illegal alien in his trial on drug charges.  We held that "the jury could reasonably infer that Sanchez had engaged in illegal conduct in the past" from those statements, and thus Sanchez's objection was warranted.  ***Id.*** Nevertheless, we found that the error was harmless, because "the evidence of guilt [was] overwhelming[,]" and "the isolated reference to Sanchez as an illegal alien [was] totally inconsequential."  ***Id.*** at 622.

Here, Appellant contends that Detective Kreller's referencing of a prior criminal investigation was reversible error, and should have resulted in a mistrial, particularly since the matter had been the subject of multiple pretrial rulings on both the defense's and prosecution's motions *in limine*.  Appellant's Brief at 65-67.  Appellant analyzes only one case in support of

- 41 -

his argument, **Commonwealth v. Padilla**, 923 A.2d 1189 (Pa. Super. 2007).

In **Padilla**, the defendant, 21 years old at the time of his crime, was convicted of committing sexual offenses against a 15-year-old.[7]  Prior to trial, Padilla filed a motion *in limine* "to preclude evidence of his prior incarceration and parole status, the issuance of a PFA order against him, and his use of marijuana." **Id.** at 1192.  Nevertheless, "in response to an open-ended question about what he found when he arrived at the scene[,]" a police officer testified as follows:

> When I got there I found—I was met at the door by the mother who was very upset, yelling and carrying on, practically mad at me, but she started to tell me how everybody was downstairs. She went and picked up this guy [Appellant]. He's a family friend. *Apparently he just got out of jail,* and so she was doing him a favor.

**Id.**

The defense immediately objected and requested a mistrial, and although the trial court initially appeared inclined to grant it, it instead issued a curative instruction and put off declaring a mistrial until the following day, affording the parties the opportunity to seek case authority supporting their positions.   After arguments were heard the following morning, the trial court ultimately denied the motion for a mistrial.

---

[7] The victim admitted that the sexual relations were consensual; however, the age gap between the two did not permit legal recognition of her consent.

On appeal, we reversed, determining that the officer's statement was clearly prejudicial because the trial court had entered an "explicit order that no reference whatsoever must be made to [Appellant's] time in jail." ***Id.*** at 1193. The ***Padilla*** Court went on to determine whether that prejudice was cured by the instruction, and determined that it was not:

> Based on our review of the trial transcript, we find the circumstances surrounding the court's ruling to be troubling and the instruction itself too vague to have cured the prejudice. The trial court had granted [Padilla's] motion in limine and, upon violation of its order, agreed to a mistrial. Pressed by the prosecutor, however, the trial court instead opted to give a cautionary instruction and await further argument. The record suggests that the jury may have heard the side bar conference during which the trial court reversed itself. Moreover, the trial court's instruction did not specifically direct the jury to disregard Officer Bealer's remark, "Apparently he just got out of jail." Then, despite the instruction, the prosecutor resumed his examination of Officer Bealer by repeating the officer's testimony that "Mom was upset," thereby allowing the jury to hear again testimony the trial court had just instructed them to disregard.

> The purpose of a pretrial motion in limine is to prevent prejudicial evidence from reaching the jury, based on the theory that "once the 'skunk is in the box,' the odor is ineradicable." ***Given the circumstances in this case***, we conclude that the only remedy available to remove the prejudice to [Padilla] was for the trial court to declare a mistrial and to relist the case for trial before a different jury. Because the trial court failed to employ this remedy to dissipate the prejudice that accrued to [Padilla] as a result of the trial court's ruling regarding Officer Bealer's testimony, [Padilla] is entitled to a new trial.

***Id.*** at 1196 (emphasis added).

As noted above, Appellant focuses his argument on the fact that the motions *in limine* in this case had precluded any other prior-bad-acts evidence. To the extent that Appellant contends the existence of those

pretrial rulings is a significant factor in our analysis of the resulting prejudice from Detective Kreller's testimony, we agree that **Padilla** stands for that proposition. However, to the extent he implies by his argument that it is the only factor we should or can consider, we disagree.

The **Padilla** Court's prejudice analysis was not limited to the fact that a pretrial ruling had precluded the at-issue testimony. The Court also considered that the jury had overheard the side bar conference addressing the matter, the inadequacy of the curative instruction issued, and the subsequent questioning by the prosecutor. As such, while important, the existence of a relevant pretrial order prohibiting the prejudicial remarks which subsequently occurred at trial does not automatically preclude a determination that the error was harmless.

Indeed, in **Commonwealth v. Hudson**, 955 A.2d 1031, 1034 (Pa. Super. 2008), the defendant filed, and the trial court granted, "a motion *in limine* seeking the preclusion of any evidence of [his] prior convictions." Nevertheless, at trial, a witness testified that the defendant "had to go see his parole officer or probation officer." **Id.** Following an objection, the trial court immediately issued a curative instruction. On appeal, this Court held that:

> Based upon this record, we conclude that [the] testimony regarding Hudson's probation or parole officer was inadvertent, even when viewed in light of Hudson's motion *in limine*. The prosecutor did not ask a question that could have been reasonably foreseen to elicit evidence of Hudson's prior criminal activities. Furthermore, [the] testimony constituted a mere passing reference to

- 44 -

> Hudson's prior criminal activity that the trial court's cautionary instruction adequately cured. Judge Johnson not only clearly instructed the jury to disregard the testimony when deliberating on the verdict, he also expressly instructed them that they had no basis upon which to determine whether the testimony itself was true. When viewed in light of the substantial circumstantial evidence presented by the Commonwealth at trial indicating Hudson's guilt, we conclude that Hudson did not suffer improper prejudice from this reference to his prior criminal activity.

*Id.* at 1035.

We find that this case is distinguishable from *Padilla* on the facts, and more in line with our decision in *Hudson*. The pretrial motions in this case did not constitute an absolute ban on prior-bad-acts evidence, unlike in *Padilla*, where there was an absolute and specific bar to any mention of Padilla's prior incarceration. Here, the pretrial motions permitted some, but not all, of the defendants' prior bad acts. In *Padilla*, the officer directly mentioned Padilla's prior incarceration. In this case, however, Detective Kreller mentioned "probable cause," thus alluding to a prior investigation, but not necessarily a prior conviction, or even charges for prior criminal misconduct, and none of the defendants were specified in Detective Kreller's remarks.

Furthermore, because other prior-bad-acts evidence was deemed admissible in this case, any additional prejudice resulting from Detective Kreller's remarks was necessarily minimal in comparison. *See Commonwealth v. Fell*, 309 A.2d 417, 420 (Pa. 1973) (holding prejudice from erroneously admitted evidence was harmless where it was cumulative

of properly admitted evidence). While substantial evidence and testimony was heard regarding the other prior-bad-acts evidence in this case over the course of a two-week trial, Detective Kreller's objectionable remarks were relatively brief and inconsequential. No comparable circumstances existed in *Padilla*.

Moreover, unlike what occurred in *Padilla*, there is no indication that the jury in this case overheard counsel's arguments regarding Detective Kreller's statements. While the trial court in this case did admonish the prosecutor for failing to adhere to the terms of the pretrial orders, the court did not vacillate between granting and denying the motion for a mistrial.

Here, as in *Hudson*, there does not appear to be any deliberate attempt by the prosecutor to elicit the at-issue remarks by Detective Kreller. Indeed, in Appellant's brief, he makes no attempt to claim the remarks were elicited. Moreover, because neither Appellant nor his co-defendants immediately objected to Detective Kreller's remarks, but instead at the end of his testimony (which did occur soon thereafter), the jury's attention was unlikely to have been drawn to them.

Finally, the evidence presented by the Commonwealth in this case was overwhelming and uncontroverted. The GPS and historical cell phone data evidence, alone, was compelling evidence of the defendants' guilt. The prior-bad-acts evidence, in conjunction with the evidence demonstrating a common *modus operandi* for each burglary, demonstrated that Appellant and his cohorts engaged in a long-term, sophisticated conspiracy to

burglarize multiple gas stations and similar establishments. Accordingly, for these reasons, we conclude that Detective Kreller's remarks were also harmless error, and/or that they were not "of such a nature that [their] unavoidable effect [was] to deprive [A]ppellant of a fair trial." **Crawley**, 526 A.2d at 342.

Judgment of sentence **affirmed**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/1/2017